<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                     For the First Circuit

No. 98-1657

        SARAH P. WESSMANN, p.p.a. HENRY ROBERT WESSMANN,

                     Plaintiff, Appellant,

                               v.

                       ROBERT P. GITTENS,
      CHAIRPERSON OF THE BOSTON SCHOOL COMMITTEE, ET AL.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Joseph L. Tauro, U.S. District Judge]

                             Before

           Selya, Boudin and Lipez, Circuit Judges.
                                

    Michael C. McLaughlin for appellant.
    Chester Darling on brief for Citizens for the Preservation of
Constitutional Rights, amicus curiae.
    Frances S. Cohen, with whom Janet A. Viggiani, Hill & Barlow,
Merita Hopkins, Corporation Counsel of the City of Boston, and
Diane DiIanni, Special Assistant Corporation Counsel (Boston School
Committee), were on brief, for appellees.
    Elaine R. Jones, Theodore M. Shaw, Norman J. Chachkin, and
Kimberly West-Faulcon, NAACP Legal Defense and Educational Fund,
Ozell Hudson, Jr., Lawyers' Committee for Civil Rights Under Law of
the Boston Bar Association, E. Macey Russell, Peabody & Arnold,
Jonathan M. Albano, Denise J. Casper and Bingham Dana LLP on brief
for Boston Branch, NAACP, and various individuals, amici curiae.

November 19, 1998

 SELYA, Circuit Judge.  The City of Boston operates three
renowned "examination schools," the most prestigious of which is
Boston Latin School (BLS).  The entrance points for admission to
BLS occur principally at the seventh- and ninth-grade levels.  In
this litigation, plaintiff-appellant Henry Robert Wessmann, on
behalf of his minor child, Sarah P. Wessmann, challenges the
constitutionality of BLS's admissions policy (the Policy).  The
district court rebuffed Wessmann's challenge.  See Wessmann v.
Boston Sch. Comm., 996 F. Supp. 120 (D. Mass. 1988).  On appeal, we
must decide whether the Policy, which makes race a determining
factor in the admission of a subset of each year's incoming
classes, offends the Constitution's guarantee of equal protection.  
We conclude that it does.
I.  BACKGROUND
 We essay a brief historical reconnaissance to set the
present dispute in perspective.
 Over two decades ago, a federal district court adjudged
the City of Boston (through its School Committee) to have violated
the constitutional rights of African-American children by promoting
and maintaining a dual public school system.  See Morgan v.
Hennigan, 379 F. Supp. 410, 480-81 (D. Mass. 1974) (Morgan I).  
Although the court found the school system as a whole guilty of dejure segregation, no specific evidence was produced to suggest that
BLS's examination-based admissions policy discriminated against
anyone or that those responsible for running BLS intended to
segregate the races.  See id. at 467-68.  Nonetheless, BLS
exhibited some of the symptoms of segregation:  an anomalously low
number of African-American students attended the school, see id. at
466 (tabulating statistics for examination schools), and the school
had just changed its entrance testing methods pursuant to a consent
decree settling charges that the earlier methods were themselves
discriminatory, see id. at 467-68.  These factors, combined with
the City's inability to demonstrate that existing racial imbalances
were not a result of discrimination, led the court to conclude that
the City's examination schools (BLS included) were complicit in
promoting and maintaining the dual system.  See id.  The
presumption established by the Supreme Court in Keyes v. School
Dist. No. 1, 413 U.S. 189, 210 (1973), to the effect that a finding
of intentional segregation in a "meaningful portion" of a school
system suggests that other segregated schooling in the system is
not accidental, played a pivotal role both in the district court's
holding and in our ensuing affirmance.  See Morgan v. Kerrigan, 509
F.2d 580, 594 (1st Cir. 1974) (affirming Morgan I, 379 F. Supp. at
467).
 The remedy adopted by the district court, among other
things, obligated BLS to ensure that at least 35% of each entering
class would be composed of African-American and Hispanic students.  
See Morgan v. Kerrigan, 401 F. Supp. 216, 258 (D. Mass. 1975).  
Relying on the Keyes presumption, we affirmed this set-aside as
part of a comprehensive plan to ameliorate pervasive and persistent
constitutional infirmities throughout the Boston public schools.  
See Morgan v. Kerrigan, 530 F.2d 401, 425 (1st Cir. 1976).
 The Boston school system began  gradually to mend its
ways.  By 1987, systemic progress permitted us to conclude that,
for all practical purposes, the School Committee had achieved
unitariness in the area of student assignments.  See Morgan v.
Nucci, 831 F.2d 313, 326 (1st Cir. 1987).  We based our conclusion
not only on the distribution of students throughout the City's
schools, but also on the good faith demonstrated by school
administrators in conforming with the demands of meaningful change.  
See id. at 319-26.  Because comparable improvement had not been
accomplished in other areas, such as faculty and staff integration
and the renovation of facilities, we instructed that federal court
supervision of elements other than student assignment continue.  
See id. at 327-32.  The district court thereupon relinquished
control over student assignments, even while retaining active
supervision over other aspects of the school system.
 After 1987, the City's three examination schools   BLS,
Boston Latin Academy, and the O'Bryant School    were no longer
under a federal court mandate to maintain a 35% set-aside.  
Nevertheless, the School Committee remained committed to the policy
until 1995, when a disappointed applicant challenged the set-
aside's constitutionality.  The district court granted injunctive
relief directing the complainant's admission to BLS.  SeeMcLaughlin v. Boston Sch. Comm., 938 F. Supp. 1001, 1018 (D. Mass.
1996).  The School Committee then discontinued the 35% set-aside.
 Concerned that the number of African-American and
Hispanic students admitted to the examination schools might drop
precipitously without a predetermined set-aside, school officials
began researching alternative admissions policies in hopes of
finding one that might prevent that result without offending the
Constitution.  The effort started in mid-1996 under the hegemony of
Thomas Payzant, superintendent of the Boston public schools.  
Payzant commissioned Bain & Co. (Bain), a consulting firm, to
review an array of admissions options ranging from lotteries to
strict merit-selection plans and to report on how each option might
affect the racial and ethnic composition of the examination
schools' entering classes.
 After Payzant informed the School Committee of Bain's
preliminary findings, Robert P. Gittens, the School Committee
chairman, appointed a task force to study the matter.  The task
force held meetings, hosted public hearings, and ultimately
recommended the adoption of Bain's "Option N50."  Bain's study
showed that a major difference between Option N50 and some other
possible alternatives (such as a strict merit-selection option) was
that the former would minimize the diminution of black and Hispanic
student admissions expected to result from abandonment of the 35%
set-aside.  Three members dissented from this recommendation.  The
School Committee nonetheless accepted Option N50, effective for the
1997-98 school year.  Option N50 thereupon became the core of the
Policy.
 We recount the Policy's most salient features, leaving
aside complexities not relevant to the case at hand.  To gain
admission to one of Boston's three examination schools, a student
must take a standardized test.  Based on a mathematical formula
that purports to predict academic performance, school hierarchs
combine each applicant's test score with his or her grade point
average, derive a composite score, rank all applicants accordingly,
and proceed to assign individuals to the applicant pool for the
examination school(s) in which they have indicated an interest.  To  
be eligible for admission to any of the examination schools, an
applicant must be in the qualified applicant pool (QAP), a group
composed of those who rank in the top 50% of the overall applicant
pool for that particular school.
 Half of the available seats for an examination school's
entering class are allocated in strict accordance with composite
score rank order.  The other half are allocated on the basis of
"flexible racial/ethnic guidelines" promulgated as part of the
Policy.  To apply these guidelines, school officials first
determine the relative proportions of five different racial/ethnic
categories   white, black, Hispanic, Asian, and Native American   
in the remaining pool of qualified applicants (RQAP), that is, the
QAP for the particular school minus those persons already admitted
on the basis of composite score rank order alone.  They then fill
the open seats in rank order, but the number of students taken from
each racial/ethnic category must match the proportion of that
category in the RQAP.  Because the racial/ethnic distribution of
the second group of successful applicants must mirror that of the
RQAP, a member of a designated racial/ethnic group may be passed
over in favor of a lower-ranking applicant from another group if
the seats allotted for the former's racial/ethnic group have been
filled.
 Sarah Wessmann encountered such a fate.  BLS had 90
available seats for the 1997 ninth-grade entering class.  Based on
her composite score, Sarah ranked 91st (out of 705) in the QAP.  To
fill the first 45 seats, the school exhausted the top 47 persons on
the list (two aspirants declined in order to accept invitations
from another examination school).  Had composite scores alone
dictated the selection of the remainder of the ninth-grade entering
class, Sarah would have been admitted.  But the racial/ethnic
composition of the RQAP was 27.83% black, 40.41% white, 19.21%
Asian, 11.64% Hispanic, and 0.31% Native American.  Consequently,
the Policy required school officials to allocate the final 45 seats
to 13 blacks, 18 whites, 9 Asians, and 5 Hispanics.  As a result,
black and Hispanic students whose composite score rankings ranged
from 95th to 150th displaced Sarah and ten other white students who
had higher composite scores and ranks.
 Acting to Sarah's behoof, her father sued a coterie of
defendants (collectively, the School Committee), alleging that the  
the Policy had defeated her candidacy and challenging its
constitutionality.  Following a 13-day bench trial, the district
court held that the School Committee's interests in promoting a
diverse student body and remedying vestiges of past discrimination
were compelling, and that the means crafted by the School Committee
to further these interests were not so expansive as to raise
constitutional concerns.  See Wessmann, 996 F. Supp. at 127-32.  
This appeal ensued.
II.  ANALYSIS
 We divide our analysis into four segments, beginning with
the standards that govern our review, then addressing the general
idea of "compelling governmental interests," and, finally,
proceeding to consider seriatim the two justifications asserted by
the School Committee in defense of the Policy.
                    A.  Standards of Review.
 The Supreme Court consistently employs sweeping language
to identify the species of racial classifications that require
strict scrutiny, see Adarand Constructors, Inc. v. Pea, 515 U.S.
200, 224 (1995) (plurality op.) (concluding upon a review of the
Court's precedents that government must "justify any racial
classification subjecting [a] person to unequal treatment under the
strictest judicial scrutiny"); Wygant v. Jackson Bd. of Educ., 476
U.S. 267, 273 (1986) (plurality op.) (remarking that racial
distinctions of "any sort" invite "the most exacting judicial
examination") (citation and internal quotation marks omitted), and
the Policy fits comfortably within this rubric.  We conclude,
therefore, that strict scrutiny is the proper standard for
evaluating the Policy.  Hence, the Policy must be both justified by
a compelling governmental interest and narrowly tailored to serve
that interest in order to stand.
 The School Committee's rejoinder   that the Policy is not
a quota   is a non sequitur.  We agree that the Policy does not
constitute a quota   at least not in the literal sense of an
unchanging set-aside   but that fact gains the School Committee
little ground.  At a certain point in its application process   
specifically, during the selection of the second half of each
incoming class   the Policy relies on race and ethnicity, and
nothing else, to select a subset of entrants.  Thus, whether the
Policy is truly a quota or whether it is best described otherwise
is entirely irrelevant for the purpose of equal protection
analysis.  Attractive labeling cannot alter the fact that any
program which induces schools to grant preferences based on race
and ethnicity is constitutionally suspect.  See Regents of Univ. of
Cal. v. Bakke, 438 U.S. 265, 289 (1978) (opinion of Powell, J.)
(noting that regardless of whether the limitation at issue is
described as "a quota or a goal," it is "a line drawn on the basis
of race and ethnic status"); cf. Lutheran Church-Mo. Synod v. FCC,
141 F.3d 344, 354 (D.C. Cir. 1998) (articulating similar sentiments
anent employment preferences).
 The School Committee also asserts an entitlement to more
lenient review because the Policy neither benefits nor burdens any
particular group.  Under the flexible guidelines, the argument
goes, the racial/ethnic distribution of the entering classes will
change yearly, and thus, there is no real preference for any single
group.
 This assertion leads nowhere, for the manner in which the
Policy functions is fundamentally at odds with the equal protection
guarantee that citizens will be treated "as individuals, not as
simply components of a racial, religious, sexual or national
class."  Miller v. Johnson, 515 U.S. 900, 911 (1995) (citations and
internal quotation marks omitted).  Even though we may not know
before the fact which individuals from which racial/ethnic groups
will be affected, we do know that someone from some group will be
benefitted and a different someone from a different group will be
burdened.  Because a court's obligation to review race-conscious
programs and policies cannot be made to depend "on the race of
those burdened or benefitted by a particular classification," City
of Richmond v. J.A. Croson Co., 488 U.S. 469, 494 (1989) (plurality
op.) (citations omitted), no more is exigible to bring strict
scrutiny into play.
    A remaining issue under this heading concerns our review
of the district court's findings and conclusions.  We accord
deferential review to specific findings of fact emanating from a
bench trial.  See Fed. R. Civ. P. 52(a).  Here, however, because
the issues advanced in this appeal   specifically, whether
diversity and curing vestiges of past discrimination satisfy strict
scrutiny   raise either questions of law or questions about how the
law applies to discerned facts, our review is essentially plenary.  
See Vecios de Barrio Uno v. City of Holyoke, 72 F.3d 973, 978 (1st
Cir. 1995).
            B.  Compelling Interests:  An Overview.
    The question of precisely what interests government may
legitimately invoke to justify race-based classifications is
largely unsettled.  Of course, we know that such state action is
acceptable upon a showing, inter alia, that it is needed to undo
the continuing legacy of an institution's past discrimination.  See
Miller, 515 U.S. at 920.  We also know that the Court has rejected
the "role model" theory as a compelling interest.  See Croson, 488
U.S. at 497-98.  Beyond these examples, the case law offers
relatively little guidance.
    A few cases suggest (albeit in dictum) that remedying
past discrimination is the only permissible justification for race-
conscious action by the government.  See, e.g., id. at 493 (stating
that unless classifications based on race are "strictly reserved
for remedial settings, they may in fact promote notions of racial
inferiority and lead to a politics of racial hostility").  But in
certain milieus, some courts have accepted race-based taxonomies
that are not linked to remedying past discrimination, particularly
in settings such as law enforcement and corrections.  See Wittmerv. Peters, 87 F.3d 916, 919 (7th Cir. 1996) (collecting cases);
see also Croson, 488 U.S. at 521 (Scalia, J., concurring) (stating
that, "[a]t least where state or local action is at issue, only a
social emergency rising to the level of imminent danger to life and
limb" may justify race-conscious action).
    In considering whether other governmental interests,
beyond the need to heal the vestiges of past discrimination, may be
sufficiently compelling to justify race-based initiatives, courts
occasionally mention "diversity".  At first blush, it appears that
a negative consensus may be emerging on this point.  The Wittmercourt noted that the defendants "did not rely on generalities about
racial balance or diversity" to justify their hiring program,
suggesting that such an attempted justification would have lacked
vitality.  87 F.3d at 920.  Other courts have stated the conclusion
more explicitly.  See Lutheran Church, 141 F.3d at 354 (ruling out
diversity as a compelling governmental interest in the employment
context); Hopwood v. State of Texas, 78 F.3d 932, 948 (5th Cir.
1996) (similar, in the educational context).
    We think that any such consensus is more apparent than
real.  In the education context, Hopwood is the only appellate
court to have rejected diversity as a compelling interest, and it
did so only in the face of vigorous dissent from a substantial
minority of the active judges in the Fifth Circuit.  See Hopwood v.
State of Texas, 84 F.3d 720, 721 (5th Cir. 1996) (Politz, C.J.,
with whom King, Wiener, Benavides, Stewart, Parker, and Dennis,
JJ., joined, dissenting from denial of rehearing en banc).  The
question that divided the Fifth Circuit centered on the
precedential value of Justice Powell's controlling opinion in
Bakke.  The panel in Hopwood pronounced that opinion dead.  The
dissenting judges countered that the reports of Bakke's demise were
premature.
    It may be that the Hopwood panel is correct and that,
were the Court to address the question today, it would hold that
diversity is not a sufficiently compelling interest to justify a
race-based classification.  It has not done so yet, however, and we
are not prepared to make such a declaration in the absence of a
clear signal that we should.  See Agostini v. Felton, 117 S. Ct.
1997, 2017 (1997).  This seems especially prudent because the Court
and various individual Justices from time to time have written
approvingly of ethnic diversity in comparable settings, see, e.g.,
Wygant, 476 U.S. at 315 (Stevens, J., dissenting); Washington v.
Seattle Sch. Dist. No. 1, 458 U.S. 457, 472-73 (1982), or have
noted that the issue remains open, see Wygant, 476 U.S. at 286
(O'Connor, J., concurring).  But see Metro Broad., Inc. v. FCC, 497
U.S. 547, 614 (1990) (O'Connor, J., dissenting) ("Like the vague
assertion of societal discrimination, a claim of insufficiently
diverse broadcasting viewpoints might be used to justify equally
unconstrained racial preferences, linked to nothing other than
proportional representation of various races.").
    As matters turn out, we need not definitively resolve
this conundrum today.  Instead, we assume arguendo   but we do not
decide   that Bakke remains good law and that some iterations of
"diversity" might be sufficiently compelling, in specific
circumstances, to justify race-conscious actions.  It is against
this chiaroscuro backdrop that we address the School Committee's
asserted "diversity" justification for the Policy.  Thereafter, we
turn to its alternate justification:  that the Policy is an
appropriate means of remediating the vestiges of past
discrimination.

                         C.  Diversity.
    The word "diversity," like any other abstract concept,
does not admit of permanent, concrete definition.  Its meaning
depends not only on time and place, but also upon the person
uttering it.  See Towne v. Eisner, 245 U.S. 418, 425 (1918)
(Holmes, J.) ("A word is not a crystal, transparent and unchanged,
it is the skin of a living thought and may vary greatly in color
and content according to the circumstances and the time in which it
is used."); Hanover Ins. Co. v. United States, 880 F.2d 1503, 1504
(1st Cir. 1989) (warning of the fallacy of believing that "a word
is a word is a word").  It would be cause for consternation were a
court, without more, free to accept a term as malleable as
"diversity" in satisfaction of the compelling interest needed to
justify governmentally-sponsored racial distinctions.
    The School Committee demurs.  Citing to Swann v.
Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16 (1971) (stating
that school authorities have "broad power to formulate and
implement educational policy," including prescribing a specific
percentage of minority students to attend each school "in order to
prepare students to live in a pluralistic society") (dictum), it
labors to persuade us that we would be warranted in deferring to
its judgment because school officials necessarily enjoy substantial
discretion in making education policy.  We are not convinced.
    The Swann song upon which the School Committee relies
cannot be wrested from the score. Cf. Gomillion v. Lightfoot, 364
U.S. 339, 343-44 (1960) (admonishing that, "[p]articularly in
dealing with claims under broad provisions of the Constitution,
which derive content by an interpretive process of inclusion and
exclusion, it is imperative that generalizations, based on and
qualified by the concrete situations that gave rise to them, must
not be applied out of context in disregard of variant controlling
facts").  Swann was decided when dual educational systems were a
reality and efforts to dismantle them were being frustrated by
school officials who demonstrated little ardor for implementing the
mandates of desegregation.  Chary that the exigencies of the need
for change might precipitate a rush to judgment, the Justices
confirmed that federal courts must put the horse before the cart,
that is, they must diagnose some constitutional malady before
beginning to dispense remedies.  See Swann, 402 U.S. at 16.  Thus,
the Swann dictum, properly construed, recognizes that a low
percentage of minority students in a particular school does not
necessarily betoken unconstitutional conduct, but may result from
innocent causes (say, the population distribution of a given
district), and warns that, unless a skewed enrollment pattern is
caused by  unconstitutional student assignment practices, federal
courts must defer to school officials' discretion and refrain from
imposing remedies.
    This well-accepted principle does not help the School
Committee.  The  Swann Court had no occasion to consider the
question, central to this appeal, of whether and to what extent the
Constitution circumscribes school officials' discretion to
formulate and implement an admissions policy that embraces a
particular brand of pluralism.  Cf. Bakke, 438 U.S. at 314 (opinion
of Powell, J.) ("Although a university must have wide discretion in
making the sensitive judgments as to who should be admitted,
constitutional limitations protecting individual rights may not be
disregarded.").  In the end, then, the School Committee's reference
to Swann only begs the question:  Swann reiterated that federal
courts must grant remedies where there are constitutional
violations, and the question here is whether the School Committee
itself has violated the Constitution.  It follows that, in order to
persuade us that diversity may serve as a justification for the use
of a particular racial classification, the School Committee must do
more than ask us blindly to accept its judgment.  It must give
substance to the word.
    The School Committee endeavors to meet this challenge
primarily by lauding benefits that it ascribes to diversity.  
Drawing on the testimony of various witnesses (school
administrators, experts, and alumni), the Committee asserts that,
because our society is racially and ethnically heterogeneous,
future leaders must learn to converse with and persuade those who
do not share their outlook or experience.  This imperative becomes
even more urgent because technology, now more than ever, forces
heretofore estranged nations and cultures to communicate and
cooperate.  For these reasons, the School Committee exhorts us to
find that diversity is essential to the modern learning experience.
    Stated at this level of abstraction, few would gainsay
the attractiveness of diversity.  Encounters between students of
varied backgrounds facilitate a vigorous exchange of ideas that not
only nourishes the intellect, but also furthers mutual
understanding and respect, thereby eroding prejudice and acting as
a catalyst for social harmony.  Indeed, Justice Powell's opinion in
Bakke acknowledges that these very attributes may render an
educational institution's interest in promoting diversity
compelling.  See id.     In the last analysis, however, the School
Committee's reliance on generalizations undercuts its construct.  
If one is to limit consideration to generalities, any proponent of
any notion of diversity could recite a similar litany of virtues.  
Hence, an inquiring court cannot content itself with abstractions.  
Just as Justice Powell probed whether the racial classification at
issue in Bakke in fact promoted the institution's stated goals, seeid. at 315-19, we must look beyond the School Committee's recital
of the theoretical benefits of diversity and inquire whether the
concrete workings of the Policy merit constitutional sanction.  
Only by such particularized attention can we ascertain whether the
Policy bears any necessary relation to the noble ends it espouses.  
In short, the devil is in the details.
    By its terms, the Policy focuses exclusively on racial
and ethnic diversity.  Its scope is narrowed further in that it
takes into account only five groups   blacks, whites, Hispanics,
Asians, and Native Americans   without recognizing that none is
monolithic.  No more is needed to demonstrate that the School
Committee already has run afoul of the guidance provided by the
principal authority on which it relies:  "The diversity that
furthers a compelling state interest encompasses a far broader
array of qualifications and characteristics of which racial or
ethnic origin is but a single though important element."  Id. at
315.  A single-minded focus on ethnic diversity "hinder[s] rather
than further[s] attainment of genuine diversity."  Id.  Nor is the
Policy saved because the student assignments that it dictates are
proportional to the composition of the RQAP.  See id. (noting that
the adoption of a "multitrack" program "with a prescribed number of
seats set aside each for identifiable category of applicants" would
not heal the admissions plan's constitutional infirmity).
    When we articulated this concern at oral argument, the
School Committee's able counsel responded that it is unnecessary
for the Policy to consider other indicia of diversity because BLS
historically has been diverse with respect to everything but race
and ethnicity.  For empirical confirmation of this assertion, the
School Committee points to Bain's handiwork.  Having analyzed
various admissions options, Bain suggested that all the options
would result in substantial gender, neighborhood, and socioeconomic
diversity, but that, unless race and ethnicity were explicitly
factored into the admissions calculus, attainment of racial and
ethnic diversity might be jeopardized.  This attempted confirmation
does not pass constitutional muster.
    If, as we are told, diversity has been attained in all
areas other than race and ethnicity, then the School Committee's
argument implodes.  Statistics compiled for the last ten years show
that under a strict merit-selection approach, black and Hispanic
students together would comprise between 15% and 20% of each
entering class, and minorities, in toto, would comprise a
substantially greater percentage.  Even on the assumption that the
need for racial and ethnic diversity alone might sometimes
constitute a compelling interest sufficient to warrant some type of
corrective governmental action, it is perfectly clear that the need
would have to be acute   much more acute than the relatively modest
deviations that attend the instant case.  In short, the School
Committee's flexible racial/ethnic guidelines appear to be less a
means of attaining diversity in any constitutionally relevant sense
and more a means for racial balancing.  The Policy's reliance on a
scheme of proportional representation buttresses this appearance
and indicates that the School Committee intended mainly to achieve
a racial/ethnic "mix" that it considered desirable.  Indeed, Bain's
Option N50 was chosen and incorporated into the Policy because it
held out the promise of increasing minority representation over the
roughly 18% that Bain anticipated would result on a strict merit-
selection basis.
    The testimony at trial amply confirms this suspicion.  
Superintendent Payzant testified that a "fair representation of a
cross-section of students" of the Boston public schools would
constitute a proper "reference point" for defining a "diverse mix"
of students.  The "cross-section" to which he referred is comprised
of the proportions of seventh- and ninth-grade black, Hispanic,
white, and Asian students enrolled in Boston's public high schools.  
Another "reference point" mentioned by Payzant  was the
"proportional representation" embodied by the Policy, which, given
his other testimony, is ultimately designed to move in the
direction of the same racial/ethnic distribution.  Other school
officials, such as Dr. Elizabeth Reilinger and Dr. Edwin Melendez,
testified to like effect, sometimes invoking the notion of
"underrepresentation."
    We do not question the School Committee's good
intentions.  The record depicts a body that is struggling valiantly
to come to terms with intractable social and educational issues.  
Here, however, the potential for harmful consequences prevents us
from succumbing to good intentions.  The Policy is, at bottom, a
mechanism for racial balancing   and placing our imprimatur on
racial balancing risks setting a precedent that is both dangerous
to our democratic ideals and almost always constitutionally
forbidden.  See Freeman v. Pitts, 503 U.S. 467, 494 (1992); Croson,
488 U.S. at 507.  Nor does the School Committee's reliance on
alleviating underrepresentation advance its cause.  
Underrepresentation is merely racial balancing in disguise   
another way of suggesting that there may be optimal proportions for
the representation of races and ethnic groups in institutions.  SeeLutheran Church, 141 F.3d at 352.
    It cannot be said that racial balancing is either a
legitimate or necessary means of advancing the lofty principles
recited in the Policy.  The closest the School Committee comes to
linking racial balancing to these ideals is by introducing the
concept of "racial isolation."  The idea is that unless there is a
certain representation of any given racial or ethnic group in a
particular institution, members of that racial or ethnic group will
find it difficult, if not impossible, to express themselves.  Thus,
the School Committee says, some minimum number of black and
Hispanic students   precisely how many, we do not know   is
required to prevent racial isolation.
    Fundamental problems beset this approach.  In the first
place, the "racial isolation" justification is extremely suspect
because it assumes that students cannot function or express
themselves unless they are surrounded by a sufficient number of
persons of like race or ethnicity.  Insofar as the Policy promotes
groups over individuals, it is starkly at variance with Justice
Powell's understanding of the proper manner in which a diverse
student body may be gathered.  See Bakke, 458 U.S. at 318.  
Furthermore, if justified in terms of group identity, the Policy
suggests that race or ethnic background determines how individuals
think or behave   although the School Committee resists this
conclusion by arguing that the greater the number of a particular
group, the more others will realize that the group is not
monolithic.  Either way, the School Committee tells us that a
minimum number of persons of a given race (or ethnic background) is
essential to facilitate individual expression.  This very position
concedes that the Policy's racial/ethnic guidelines treat
"individuals as the product of their race," a practice that the
Court consistently has denounced as impermissible stereotyping.  
Miller, 515 U.S. at 912.
    In the second place, the School Committee has failed to
give us a plausible reason why we should believe that racial
balancing of any type is necessary to promote the expression of
ideas or any of the other ideals referenced in the Policy.  We
assume for argument's sake   albeit with considerable skepticism   
that there may be circumstances under which a form of racial
balancing could be justified by concerns for attaining the goals
articulated by the Policy.  To justify something so antithetical to
our constitutional jurisprudence, however, a particularly strong
showing of necessity would be required.  The School Committee has
provided absolutely no competent evidence that the proportional
representation promoted by the Policy is in any way tied to the
vigorous exchange of ideas, let alone that, in such respects, it
differs significantly in consequence from, say, a strict merit-
selection process.  Nor has the School Committee concretely
demonstrated that the differences in the percentages of students
resulting from the Policy and other, constitutionally acceptable
alternatives are significant in any other way, such as students'
capacity and willingness to learn.  To the contrary, the School
Committee relies only on broad generalizations by a few witnesses,
which, in the absence of solid and compelling evidence, constitute
no more than rank speculation.  Given both the Constitution's
general prohibition against racial balancing and the potential
dangers of stereotyping, we cannot allow generalities emanating
from the subjective judgments of local officials to dictate whether
a particular percentage of a particular racial or ethnic group is
sufficient or insufficient for individual students to avoid
isolation and express ideas.
    This brings us full circle.  Although Justice Powell
endorsed diversity as potentially comprising a compelling interest,
he warned that a proper admissions policy would be such that if an
applicant "loses out" to another candidate, he will "not have been
foreclosed from all consideration for that seat simply because he
was not the right color or had the wrong surname."  Bakke, 458 U.S.
at 318.  The Policy does precisely what Justice Powell deemed
anathematic:  at a certain point, it effectively forecloses some
candidates from all consideration for a seat at an examination
school simply because of the racial or ethnic category in which
they fall.  That happened to Sarah Wessmann.  It violated the Equal
Protection Clause.  See People Who Care v. Rockford Bd. of Educ.,
111 F.3d 528, 538 (7th Cir. 1997) (concluding that preventing
"children who are not beneficiaries of past discrimination" from
becoming cheerleaders solely because of their race is "a barefaced
denial of equal protection").
    Again, let us be perfectly clear.  We are aware that two
of our sister courts of appeals have suggested that diversity may
never constitute a compelling governmental interest sufficient to
warrant race-based classifications.  See Lutheran Church, 141 F.3d
at 354; Hopwood, 78 F.3d at 948.  For purposes of resolving this
appeal, however, we need not speak definitively to that vexing
question.  Experience is "the life of the law," Justice Holmes
commented, and more probably ought to be said before this chapter
of constitutional inquiry is closed.  We conclude today only that
the School Committee's Policy does not meet the Bakke standard and,
accordingly, that the concept of "diversity" implemented by BLS  
does not justify a race-based classification.
              D.  Vestiges of Past Discrimination.
    The School Committee endeavors, in the alternative, to
uphold the Policy as a means of redressing the vestiges of past
discrimination.  The court below accepted this explanation.  SeeWessmann, 996 F. Supp. at 131.  We do not.
    Governmental bodies have a significant interest in
adopting programs and policies designed to eradicate the effects of
past discrimination.  See Miller, 515 U.S. at 920; Mackin v. City
of Boston, 969 F.2d 1273, 1275 (1st Cir. 1992).  Before embarking
on such projects, however, government actors must be able to muster
a "strong basis in evidence" showing that a current social ill in
fact has been caused by such conduct.  See Croson, 488 U.S. at 500.  
In giving meaning to the phrase "strong basis in evidence," we are
guided primarily by the Court's particularized analysis in Crosonand by the "body of appellate jurisprudence [that] has developed to
provide that label with meaningful content."  Engineering
Contractors Ass'n of S. Fla., Inc. v. Metropolitan Dade County, 122
F.3d 895, 909 (11th Cir. 1997), cert. denied, 118 S. Ct. 1186
(1998).
    The threshold problem that we confront in this instance
is that the School Committee disclaims the necessity for such
evidence.  Its disclaimer rests on the premise that a decree issued
in the quarter-century-old desegregation litigation mandates local
authorities to remedy any racial imbalance occurring in the school
system and thereby obviates the need for an independent showing of
causation.  This premise lacks force.
    The decree in question was entered in 1994 by Judge
Garrity, pursuant to our instructions in Morgan v. Nucci, 831 F.2d
313 (1st Cir. 1987).  The particular provision to which the School
Committee refers is entitled "Permanent Injunction."  It enjoins
the School Committee "from discriminating on the basis of race in
the operation of the public schools of the City of Boston and from
creating, promoting or maintaining racial segregation in any school
or other facility in the Boston public school system."  Nothing in
the plain language of this provision requires school officials to
undertake any affirmative action, let alone to adopt a race-based
classification (such as is contained in the Policy).  Perhaps more
important, the cited provision is not (as the School Committee
would have it) a mandatory injunction.  Rather, it operates as a
negative injunction, forbidding the defendants from engaging in the
acts that supported the original cause of action.  As long as
school officials do not engage in discrimination against minorities
 and there is no evidence that such conduct persists at BLS   they
have not violated the injunction.
    The School Committee's contention that racial imbalance,
without more, mandates action also is discordant with established
precepts of constitutional law.  Once there is a finding of
unitariness and the "affirmative duty to desegregate has been
accomplished," school authorities are not expected to make "year-
by-year adjustments of the racial composition of student bodies"
absent a "showing that either the school authorities or some other
agency of the State has deliberately attempted to fix or alter
demographic patterns to affect the racial composition of the
schools."  Swann, 402 U.S. at 32; see also Freeman, 503 U.S. at 494
("Once the racial imbalance due to the de jure violation has been
remedied, the school district is under no duty to remedy imbalance
that is caused by demographic factors.").
    That ends this aspect of the matter.  We concluded over
ten years ago that Boston had restored the unitariness of student
assignments, see Nucci, 831 F.2d at 319-26, and there is no
contention here that any municipal actor has attempted
intentionally to subvert the demographic composition of BLS (or any
other school, for that matter).  Under such circumstances, neither
the Constitution nor the 1994 decree impose a duty on Boston's
school officials to ensure the maintenance of certain percentages
of any racial or ethnic group in any particular school.
    Because the 1994 decree turns out to be a blind alley,
the School Committee must identify a vestige of bygone
discrimination and provide convincing evidence that ties this
vestige to the de jure segregation of the benighted past.  SeeFreeman, 503 U.S. at 494.    To meet this challenge, the School
Committee cites an "achievement gap" between black and Hispanic
students, on the one hand, and white and Asian students, on the
other, and claims that this gap's roots can be traced to the
discriminatory regime of the 1970s and before.
    The scope of what social phenomena the law considers
vestiges of past discrimination presents an open question.  The
presumptive vestiges are the well-known factors that the Supreme
Court enumerated in Green v. County Sch. Bd., 391 U.S. 430, 435
(1968) (mentioning student assignments, faculty, staff, facilities,
transportation, and extra-curricular activities).  Since Green,
federal courts have recognized other permutations, including
"quality of education."  Freeman, 503 U.S. at 492.  What this means
and how it is to be measured are difficult questions.  Rather than
entering that debate, we accept arguendo the School Committee's
position that, in principle, a documented achievement gap may act
as an indicator of a diminution in the quality of education.  Even
so, whether an achievement gap is a vestige of past discrimination
depends on whether there is satisfactory evidence of a causal
connection.
    The court below short-circuited this inquiry.  Citing
Judge Garrity's 1994 order, the court reasoned that, once there has
been a past judicial finding of institutional discrimination, no
more evidence is needed to justify a policy that employs racial
classifications.  See Wessmann, 996 F. Supp. at 131 (stating that
the 1994 order is a "manifestation" of the reality of vestiges of
past discrimination and that it alone provides a "compelling basis"
for adoption of the Policy).  The lower court was wrong.
    There are times when a history of discrimination, in
itself, may supply a powerful evidentiary predicate sufficient to
justify some race-conscious action.  See, e.g., Boston Police
Superior Officers Fed'n v. City of Boston, 147 F.3d 13 (1st Cir.
1998).  Nevertheless, such holdings do not hinge on the mere
existence of a past judicial finding, but, rather, on a variety of
considerations, including what transpired since the time of that
finding.  In Boston Police, for example, our detailed inquiry
revealed not only that discrimination had been a fact of the past,
but that it persisted in the Boston Police Department, and that
relatively little had been done to alleviate the situation at
certain levels.  See id. at 19-23.  The record showed, for
instance, that notwithstanding the existence of a consent decree,
progress toward the integration of the police force had been
"halting" and "modest."  Id. at 23.  The statistical evidence
supporting this view pertained not to a distant past, but to
present realities.  See id. at 21, 23.  In the final analysis, it
was the combination of all this evidence, and the detailed showing
that the effects of earlier discriminatory conduct continued to the
present, that underpinned our conclusions.  Withal, we took pains
to warn against indiscriminate reliance on history alone lest it
permit the adoption of remedial measures "ageless in their reach
into the past, and timeless in their ability to affect the future."  
Id. at 20-21 (citation and internal quotation marks omitted).
    In sum, whether past discrimination necessitates current
action is a fact-sensitive inquiry, and courts must pay careful
attention to competing explanations for current realities.  SeeFreeman, 503 U.S. at 495-96 (explaining that "though we cannot
escape our history, neither must we overstate its consequences in
fixing legal responsibilities").  The mere fact that an institution
once was found to have practiced discrimination is insufficient, in
and of itself, to satisfy a state actor's burden of producing the
reliable evidence required to uphold race-based action.  See id.at 496; Middleton v. City of Flint, 92 F.3d 396, 409 (6th Cir.
1996).
    Beyond history, the School Committee offers statistical
and anecdotal evidence to satisfy its burden of demonstrating a
strong evidentiary basis for the inauguration of remedial policies.  
The district court found the evidence favoring race-conscious
remedies to be adequate, but  the court's entire treatment of the
subject comprises a lone paragraph composed of unrelievedly
conclusory observations.  See Wessmann, 996 F. Supp. at 131.  In
the absence of specific findings, we could remand.  Given the time
constraints applicable to the case, we opt instead to exercise
plenary review, taking the statistical and anecdotal evidence in
the manner suggested by the School Committee.  See Vecios de
Barrio Uno, 72 F.3d at 989 (observing that appellate courts
ordinarily "should fill in blanks in the district court's account
when the record and the circumstances permit this to be done
without short-changing the parties").
    The centerpiece of the School Committee's showing
consists of statistical evidence addressed to a persistent
achievement gap at the primary school level between white and Asian
students, on the one hand, and black and Hispanic students, on the
other.  One way to measure the achievement gap is in terms of
relative performance on standardized tests.  Over the years, whites
and Asians have scored significantly higher, on average, than
blacks and Hispanics.  The School Committee theorizes that, because
of this achievement gap, BLS receives fewer African-American and
Hispanic applicants than otherwise might be the case, and even in
comparison to this modest universe, an abnormally small number of
black and Hispanic students qualify for admission.  Accordingly,
the Committee concludes that the statistics documenting the
achievement gap, on their own, satisfy the "strong basis in
evidence" requirement.
    In mounting this argument, the School Committee relies
heavily on a line of cases addressing affirmative action plans
designed to remedy vestiges of past employment discrimination.  
See, e.g., Peightal v. Metropolitan Dade County, 26 F.3d 1545 (11th
Cir. 1994); Stuart v. Roache, 951 F.2d 446 (1st Cir. 1991).  This
reliance is mislaid.  Fundamental differences distinguish the
statistical inquiry involved in the employment discrimination
context from the one proposed by the School Committee here.  In
employment discrimination cases, we know ex ante the locus of
discrimination:  it is the barrier to entry.  Based on that
premise, an appropriate statistical analysis compares the number of
qualified minority applicants with those who gain entrance.  The
greater the disparity, the stronger the inference that
discrimination is the cause of non-entry.  See Croson, 488 U.S. at
501-02; Stuart, 951 F.2d at 451.
    In this case, the "barrier to entry" comparable to those
in the employment discrimination cases is BLS's requirement of an
entrance examination and the resultant composite score   and no one
(least of all, the School Committee) claims that the examination or
any component thereof is discriminatory in operation or effect, or
that it would be discriminatory if it were used as the sole
criterion for admission.  Such a claim was central to our
conclusion in Stuart, 951 F.2d at 451, and it is totally absent
here.  What is more, any such claim would make precious little
sense in the context of the School Committee's argument, for
standardized achievement tests (a component of the entrance
examination) are the primary objective measurement of the asserted
achievement gap.
    With the admissions process eliminated as an illegitimate
barrier to entry, the achievement gap statistics, by themselves,
must specifically point to other allegedly discriminatory conduct
in order to suggest a causal link between those discriminatory acts
and the achievement gap.  Unlike the focused inquiry characteristic
of the employment discrimination cases, however, the raw
achievement gap statistics presented in this case do not by
themselves isolate any particular locus of discrimination for
measurement.  Without such a focus, the achievement gap statistics
cannot possibly be said to measure the causal effect of any
particular phenomenon, whether it be discrimination or anything
else.  Cf. McCleskey v. Kemp, 481 U.S. 279, 294-95 (1987)
(contrasting legitimacy of inferences drawn from focused use of
statistical methods in employment discrimination and venire-
selection cases, on the one hand, with those drawn from application
of general statistics to explain source of decisions in specific
trials and sentencing proceedings).  As such, the achievement gap
statistics, by themselves, do not even eliminate the possibility
that they are caused by what the Court terms "societal
discrimination."  Shaw v. Hunt, 517 U.S. 899, 909-10 (1996); seealso Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d
752, 776-78 (3d Cir. 1996) (affirming findings that poor
performance and achievement gap were caused by socioeconomic
factors unrelated to past discrimination).  To be sure, gross
statistical disparities at times may suffice to satisfy a state
actor's burden of production.  See Croson, 488 U.S. at 501.  But
the achievement gap statistics adduced here fail to do so because
it is unclear exactly what causative factors they measure.
    The Croson Court relied on precisely this reasoning when
it concluded, in the contractor context, that low minority
membership in a local trade association "standing alone, cannot
establish a prima facie case of discrimination."  Id. at 503.  The
Court reasoned that there could be "numerous explanations for this
dearth of minority participation, including past societal
discrimination."  Id.  Therefore, if such statistics are to be at
all probative of discrimination, they must link cause and effect
variables in a manner which would permit such an inference.  Seeid. ("For low minority membership in these associations to be
relevant, the city would have to link it to the number of local
MBEs eligible for membership.  If the statistical disparity between
eligible MBEs and MBE membership were great enough, an inference of
discriminatory exclusion could arise.").
    We do not propose that the achievement gap bears no
relation to some form of prior discrimination.  We posit only that
it is fallacious to maintain that an endless gaze at any set of raw
numbers permits a court to arrive at a valid etiology of complex
social phenomena.  Even strong statistical correlation between
variables does not automatically establish causation.  See Tagatzv. Marquette Univ., 861 F.2d 1040, 1044 (7th Cir. 1988); Ste. Marie
v. Eastern R.R. Ass'n, 650 F.2d 395, 400 (2d Cir. 1981) (Friendly,
J.).  On their own, the achievement gap statistics here do not even
identify a variable with which we can begin to hypothesize the
existence of a correlation.
    The School Committee attempts to compensate for this
shortcoming by pointing to certain alleged phenomena that it claims
constitute substantial causes of the achievement gap.  Chief among
these is "low teacher expectations" vis--vis African-American and
Hispanic students, a condition which the School Committee argues is
an attitudinal remnant of the segregation era.  To show the
systemic nature of this alleged phenomenon, the School Committee
leans heavily on the testimony of Dr. William Trent.  Dr. Trent, a
sociologist, identified teachers' low expectations of African-
American and Hispanic students as a significant factor underlying
the achievement gap in the Boston public schools.  He based his
conclusion on an analogy that he drew from studies he had performed
in the Kansas City school system, including a "climate survey" of
teacher attitudes and a multiple regression analysis designed to
determine whether the low expectations reflected in teachers'
answers to the questions posed in the climate survey might
partially explain the achievement gap.  Based on these materials,
Dr. Trent had concluded that, in Kansas City,  teacher "efficacy"
 a term of art referring to a teacher's success in encouraging
pupils to succeed   correlated with higher achievement test scores.
    One difficulty with Dr. Trent's testimony is that it
relies on evidence from one locality to establish the lingering
effects of discrimination in another.  Dr. Trent noted, for
example, that data he examined from the Boston public schools
revealed patterns "consistent with" his findings concerning the
Kansas City schools.  Croson, however, reaffirmed the Court's
longstanding teaching that we must staunchly resist attempts to
substitute speculation about correlation for evidence of causation.  
See Croson, 488 U.S. at 504 ("We have never approved the
extrapolation of discrimination in one jurisdiction from the
experience of another.") (citing Milliken v. Bradley, 418 U.S. 717,
746 (1974)).  In this context, the Court emphasized that although
government may adopt race-conscious remedies when there is evidence
of lingering vestiges, it "must identify that discrimination,
public or private, with some specificity" before it adopts the
remedy.  See id. at 504.  At the very least, this would require
solid evidence that Boston teachers have low expectations of
minority students, and that these low expectations are related in
a statistically significant way to the achievement gap.
    Dr. Trent, however, never conducted a "climate survey"
for the Boston school system.  His conclusions for Boston were
based only on a review of statistical data documenting the
achievement gap  (basically, the statistics regarding achievement
test results and differing application and enrollment rates),
statistics concerning teacher seniority, and anecdotal evidence
about teacher attitudes supplied by school officials.  When asked
on cross-examination whether the data that he relied on for his
conclusions anent teacher attitudes were scientifically gathered,
Dr. Trent responded in the negative.  Dr. Trent thus freely
conceded that the data he used was not of the quality necessary to
satisfy the methodological rigors required by his discipline.  
Because Dr. Trent failed to follow his own prescribed scientific
methodology for collecting data on the one issue central to his
hypothesis about achievement gap causation, the trial court could
not credit his conclusions.
    An "opinion has a significance proportioned to the
sources that sustain it."  Petrogradsky Mejdunarodny Kommerchesky
Bank v. National City Bank, 253 N.Y. 23, 25, 170 N.E. 479, 483
(1930) (Cardozo, J.).  When scientists (including social
scientists) testify in court, they must bring the same intellectual
rigor to the task that is required of them in other professional
settings.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
U.S. 579 (1993); Braun v. Lorillard, Inc., 84 F.3d 230, 234 (7th
Cir. 1996); see also People Who Care, 111 F.3d at 537 (declaring,
in reviewing admissibility of social science evidence purporting to
quantify causes of achievement gap, that "the methods used by the
expert to derive his opinion [must] satisfy the standards for
scientific methodology that his profession would require of his
out-of-court research").  The only excuse that Dr. Trent proffered
for his failure to follow proper protocols was that a thorough
study would have required more time than he had available.  That is
unacceptable.  See Braun, 84 F.3d at 234.  An expert witness can
only deviate from accepted methods of scientific inquiry in ways
that are consistent with the practices and usages of the scientific
community.
    The shortcomings in Dr. Trent's testimony largely relate
to his failure to gather data systematically and point up the
pitfalls that the School Committee invited by failing to validate
the Policy in advance.  Dr. Trent's charge was to trace the causal
relationship, if any, between teacher attitudes and poor student
performance.  His failure to obtain reliable data disabled him from
taking even the first step, for he could not validly establish
whether Boston teachers' attitudes in fact were discriminatory, let
alone show that they caused (or even significantly contributed to)
the achievement gap.  This first step is a cornerstone of the
entire research project; in its absence, Dr. Trent could not
legitimately eliminate other variables (including societal
discrimination) that might explain the achievement gap in the
Boston public schools.  See Croson, 488 U.S. at 503; People Who
Care, 111 F.3d at 537.  It follows inexorably that, with no
methodological support, he could not produce a meaningful analysis
of causation and, accordingly, his conclusions cannot bear the
weight of the School Committee's thesis.  See Mid-State Fertilizer
Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)
("An expert who supplies nothing but a bottom line supplies nothing
of value to the judicial process.").
    Dr. Trent's reliance on anecdotal evidence fares no
better.  As a general matter, anecdotal evidence is problematic
because it does not tend to show that a problem is pervasive.  SeeCoral Constr. Co. v. King County, 941 F.2d 910, 919 (9th Cir. 1991)
("While anecdotal evidence may suffice to prove individual claims
of discrimination, rarely, if ever, can such evidence show a
systematic pattern of discrimination necessary for the adoption of
an affirmative action plan.").  Thus, even though anecdotal
evidence may prove powerful when proffered in conjunction with
admissions or valid statistical evidence, anecdotal evidence alone
can establish institutional discrimination only in the most
exceptional circumstances.  See Engineering Contractors Ass'n, 122
F.3d at 925-26 (collecting cases).
    This case falls well within the general rule rather than
the long-odds exception to it.  The most specific testimony
regarding low teacher expectations came from Deputy Superintendent
Janice Jackson, whom the district court qualified as an expert
witness.  At one point in her career, Deputy Superintendent Jackson
had received some training related to improving interactions
between teachers and students (a program known as TEASA, an acronym
for "teacher expectation and student achievement") by dispelling
teachers' "unconscious biases."  Without disparaging Ms. Jackson's
credentials, we reject the contention that her observations, as
presented at trial, provide any justification for a conclusion that
a statistically meaningful number of Boston school teachers have
low expectations of minority students.
    Deputy Superintendent Jackson testified to two sets of
observations.  The first occurred before she joined the school
system.  She spent three months in classrooms as a "blind
researcher," making certain observations for an unspecified
research project.  In the process, she apparently visited six or
seven schools (although she could recall only two by name).  She
testified that, during this time, she observed teachers treat
minority and non-minority students differently.  The differential
treatment included calling on one set of pupils but not on another,
disparate reprimands for the same behavior, and failure to push for
"higher order thinking."  Her second set of observations occurred
once she became deputy superintendent.  Here, her testimony is
unrelievedly general.  Although she visited numerous schools during
this interval, her testimony is silent as to the purpose of these
visits.  It is equally silent as to crucial details, e.g., how many
classrooms she visited or how many teachers she observed.
    The short of it is that, to the extent that Ms. Jackson
purposed to testify as an expert, she was obligated to present her
data and her methodology with some specificity.  In lieu of
specifics, Ms. Jackson offered only her unsubstantiated
recollection of past events.  Croson reminds us that, in
considering the legitimacy of race classifications, we must not
blindly defer to the other branches' assurances that a particular
condition exists.  See Croson, 488 U.S. at 501-02; see also Hayesv. North State Law Enf. Officers' Ass'n, 10 F.3d 207, 214 (4th Cir.
1993) (applying Croson and concluding that police chief's testimony
did not constitute strong basis in evidence to justify race-
conscious remedy even though the testimony was "based on his
significant experience in the field of law enforcement").  Because
Ms. Jackson was unable to quantify her observations in any manner
whatsoever, the district court could not validly conclude that the
number of "problem" teachers she observed was statistically
significant.  Indeed, Dr. Trent was unable to utilize these
observations to conduct any statistical analysis to provide a
meaningful account of achievement gap causation.  This inability
illustrates one reason why anecdotal evidence, which includes
testimony based on significant personal experience, rarely suffices
to provide a strong basis in evidence.
    The remaining evidence upon which the School Committee
and the dissent relies   most notably the testimony of BLS
Headmaster Michael Contompasis and Dr. Melendez   likewise
exemplifies the shortcomings of anecdotal evidence.  One cannot
conclude from the isolated instances that these witnesses recounted
that low teacher expectations constitute a systemic problem in the
Boston public schools or that they necessarily relate to the dejure segregation of the past.
    Similarly unpersuasive are the School Committee's broad
generalizations about socialization.  Superintendent Payzant, for
example, testified that he believed that teachers who started
working in the era of dual school systems (who comprise
approximately 28 % of current faculty) had been "socialized and
shaped" by the thoughts and attitudes of the prior period.  This
may be so, but he gave no empirical evidence to confirm his
conclusion.  While the idea of "socialization" may be
intellectually elegant, courts must insist on seeing concrete
evidence.  Without such substantiation, Payzant's testimony is no
more compelling than the conclusory statements of the Richmond city
councillor rejected as insufficient by the Supreme Court in Croson,
488 U.S. at 500-01.
    To the extent that the School Committee notes other
causal factors or indicia of discrimination, they, too, are  
insufficient either to show ongoing vestiges of system-wide
discrimination or to justify a race-conscious remedy.  For
instance, pointing to the instability of leadership at the
superintendent level, the School Committee suggests   so far as we
can gather; the argument is neither developed nor clear   that it
led to the absence of a standardized curriculum, which in turn has
contributed to the achievement gap.  If the argument is that the
superintendent's office had a revolving door and thereby caused the
achievement gap, then we see nothing that helps advance the
contention that the achievement gap is a vestige of past
discrimination.  If the argument is that the superintendent's
office has tacitly endorsed disparate curricula which in turn have
caused the achievement gap, then the School Committee has provided
us with absolutely no evidentiary basis to conclude that this is a
consequence of discrimination; among other things, it has failed
either to identify which curricula were discriminatory or to
explain why they were so.  It likewise has failed to identify the
schools that adopted the discriminatory curricula in order to
suggest a relationship between race and the existence of
substandard school programs.  Thus, it is impossible to tell, even
on the assumption that differing curricula caused the achievement
gap, whether this was a consequence of discriminatory conduct.  In
a nutshell, there is not a shred of evidence in the record
supporting the contention that unstable leadership and the absence
of uniform curriculum standards bore any relationship either to
discrimination in the Boston schools or to the existence of the
achievement gap.
    We add an eschatocol of sorts.  Even if the School
Committee had proven the requisite connection between the Policy
and the vestiges of past discrimination, the Policy could not
endure.  When authorized by the Constitution, race-conscious
remedies not only must respond to a compelling governmental
interest, but also must be narrowly tailored to rectify the
specific harms in question.  See Croson, 488 U.S. at 493
(explaining that any race-conscious means adopted to remedy past
discrimination must be so narrowly tailored that there is "little
or no possibility that the motive for the classification was
illegitimate racial prejudice or stereotype").  Under this test,
the Policy sweeps too broadly.
    We limit our remarks in this regard to three points.  
First, since there is no discrimination at entry to BLS, we fail to
see how the adoption of an admissions policy that espouses a brand
of proportional representation is designed to ameliorate the harm
that allegedly has occurred (a system-wide achievement gap at the
primary school level).  Indeed, when Deputy Superintendent Jackson
was asked whether the flexible racial/ethnic guidelines in any way
affect low teacher expectations, she responded that it was a
"complicated question to answer" because, given the relatively
recent implementation of the guidelines, there had "not even been
an opportunity to check that."  If a high-level school official
cannot confirm that a race-conscious remedy will alleviate the
purported major cause of a remnant of discrimination, we do not
comprehend how that means can be narrowly tailored.
    Second, the increased admission of black and Hispanic
students cannot be viewed as partial compensation for injustices
done at the primary school level.  This is so because the victims
of the achievement gap are public school students, and they are the
ones who ought to be the focus of the remedy.  The Policy does not
focus in this direction, for many of the black and Hispanic
students admitted under it come from private or parochial schools.  
Thus, the Policy is not sufficiently particularized toward curing
the harm done to the class of actual victims.  See Podberesky v.
Kirwan, 38 F.3d 147, 158-59 (4th Cir. 1994).  After all, there is
no reason to assume that granting a remedy to one member of a
particular race or ethnic group comprises a condign remedy for harm
done to another, especially when those who have been harmed are
easily identifiable and still within the institution that allegedly
suffers from the vestiges of past discrimination.
    Third, if palliating the effects of past discrimination
is the ostensible justification for the Policy, then the Policy, on
its face, has been crafted in puzzling ways.  Suppose that in a
particular year a group of Hispanic students does very well, such
that they cluster between ranks 45 and 90, but that the Hispanic
student population in the RQAP is sparse.  Suppose further that
whites and Asians form a significant majority of the RQAP.  There
is then a likelihood that, by reason of the Policy, a number of the
Hispanic students   archetypal victims of discrimination   will be
displaced by white and Asian students.  Nor need we resort to
hypotheticals to see such effects.  At the O'Bryant School, the
Policy's flexible racial/ethnic guidelines resulted in the
rejection from the 1997 ninth-grade entering class of two Hispanic
students in favor of a white student.  Then, too, given the School
Committee's position that Asian students have not been victims of
discrimination, we are unable to comprehend the remedial purpose of
admitting Asian students over higher-ranking white students, as
happened in the case of Sarah Wessmann.  This brings us back to the
point of our beginning:  in structure and operation, the Policy
indicates that it was not devised to assuage past harms, but that
it was simply a way of assuring racial/ethnic balance, howsoever
defined, in each examination school class.  See Croson, 488 U.S. at
506 ("The random inclusion of racial groups that, as a practical
matter, may never have suffered from discrimination in the
construction industry in Richmond suggests that perhaps the city's
purpose was not in fact to remedy past discrimination.").  The
Constitution forbids such a focus.
III.  CONCLUSION
    We do not write on a pristine page.  The Supreme Court's
decisions in Croson and Adarand indicate quite plainly that a
majority of the Justices are highly skeptical of racial preferences
and believe that the Constitution imposes a heavy burden of
justification on their use.  Croson, in particular, leaves no doubt
that only solid evidence will justify allowing race-conscious
action; and the unsystematic personal observations of government
officials will not do, even if the conclusions they offer sound
plausible and are cloaked in the trappings of social science.    
See Hayes, 10 F.3d at 214 (noting the dangers of relying on
"subjective evidence" to justify race-conscious policies); see alsoWittmer, 87 F.3d at 919 (reminding us that "common sense
undergirded the pernicious discrimination against blacks now
universally regretted").
    Our dissenting brother's valiant effort to read into
Croson a broad discretion for government entities purporting to
ameliorate past discrimination strikes us as wishful thinking.  The
Croson Court's own reference to the need for a "searching judicial
inquiry," 488 U.S. at 493, and its rejection of Justice Marshall's
position, see id. at 494-95; id at 535-36 (Marshall, J.,
dissenting), both suggest an attitude that is antipathetic to those
who yearn for discretion.  And unless and until the Justices
reconfigure their present doctrine, it is the job of judges in
courts such as this to respect the letter and spirit of the Supreme
Court's pronouncements.
    We need go no further.  While we appreciate the
difficulty of the School Committee's task and admire the values
that it seeks to nourish, noble ends cannot justify the deployment
of constitutionally impermissible means.  Since Boston Latin
School's admissions policy does not accord with the equal
protection guarantees of the Fourteenth Amendment, we strike it
down.  The judgment of the district court must therefore be
reversed.
    We are mindful that Henry Wessmann asks not only that we
declare the Policy unconstitutional   which we have done   but also
that his daughter, Sarah, be admitted to BLS forthwith.  The School
Committee, which has vigorously defended the Policy, has tacitly
conceded that, if its defense fails, Sarah should be allowed to
enroll at BLS.  The circumstances of this case are unusual, for the
school year is under way and Sarah Wessmann   who already has spent
elsewhere the first year and some months of what normally would be
a four-year matriculation at BLS   does not have the luxury of time
that a remand would entail.  We therefore direct the district court
to enter a judgment, in appropriate form, that, inter alia,
commands Sarah's admission to BLS without delay.

Reversed.

                    Separate Opinions Follow  

    BOUDIN, Circuit Judge, concurring.  Judge Selya's opinion
demonstrates that the school committee plan under attack here does
involve racial preference, whatever the complexity of the plan and
subtlety in expression.  Yet, this court concluded more than a
decade ago that purposeful discrimination had ended so far as
assignments were concerned and that the school committee was
proceeding in good faith.  See Morgan v. Nucci, 831 F.2d 313, 326
n.19 (1st Cir. 1987).  To survive, the school committee's plan must
serve a compelling state interest and be narrowly tailored to
achieve that interest.  Croson, 488 U.S. at 505-08; Wygant, 476
U.S. at 274.
    The foremost interest urged by the school committee is
diversity, a ground that may or may not prove "compelling" to the
Supreme Court.  But even if diversity were an adequate ground, it
has not been shown that this plan is necessary to achieve it.  The
record shows that minorities will be included in BLS in substantial
numbers without the plan.  Op. at 20-21.  If some specific higher
level is needed to achieve diversity of views and backgrounds, this
has not been demonstrated in the record.
    The alternative interest urged on this record is that the
plan is necessary to remedy the residual effects of admitted past
discrimination.  The remnants on which the school committee relies
are supposed teacher attitudes, specifically, a lower expectation
of achievement by minorities in the Boston public schools.  These
attitudes are said to be linked backward in time to mind-sets
developed during a regime of purposeful discrimination and forward
to explain poorer performance by minority public-school students on
the tests necessary for entry into the elite public schools.  The
remedy is the racial preference embodied in the plan.
    In theory, low expectations could be caused by past
discrimination and could have some effect on current performance.  
But here the quality of the supporting evidence is far from
overwhelming.  In this case, there is no study of Boston schools,
only one for Kansas City; and the evidence as to Boston, while
offered through experts, is largely based on general statements or
anecdote.  It is open to question whether such evidence can
withstand Croson's requirement of a "searching judicial inquiry."  
Croson, 480 U.S. at 493.
    In all events, the plan fails to meet the Supreme Court's
narrow tailoring requirement.  The plan is clearly overbroad when
judged by the past-discrimination rationale; it provides
preferences to minority groups that were never discriminated
against by the Boston School authorities or affected by lowered
expectations of public school teachers (Asians and private school
African-American applicants in particular).  See Croson, 488 U.S.
at 506; Wygant, 476 U.S. at 284 n.13.  There is some reason to
think that African-American private school applicants rather than
public school students, may well be the principal beneficiary of
the preferences created by the plan.
    There is also no indication that the plan will do
anything to alter the expectations of public-school teachers, which
are claimed to be the source of the residual discrimination.  One
of the school committee's own experts, asked to say whether or how
the plan would resolve this problem, was unable to supply an
answer.  Op. at 49.  Another school committee expert, answering a
direct question from the judge as to whether the plan's racial
preference "attacked the problem of teacher attitude," essentially
conceded that it did not.  Tr. 6-126 to -127.  These admissions
suggest a further misfit between plan and remedy.
    Finally, because the plan does not address the supposed
cause of the problem, teacher attitudes formed in the ancien
regime, the same arguments now urged to sustain the plan will be
available for the indefinite future.  Teachers retire slowly and
themselves teach those who succeed them.  The plan thus creates
just the kind of "timeless" racial preferences of concern to the
Supreme Court.  Wygant, 476 U.S. at 276; see Croson, 488 U.S. at
498, 505; cf. United States v. Paradise, 480 U.S. 149, 178 (1987).
    None of these defects of fit is surprising because, at
bottom, the plan is not seriously suited to be a temporary measure
to remedy low teacher expectations that are the supposed remnants
of discrimination.  It is instead a thoughtful effort to assist
minorities historically disadvantaged while, at the same time,  
preserving the essentially competitive character of the schools in
question.  So viewed, there is no misfit between problem and
remedy; the only misfit is with Croson's requirements for the use
of racial preferences, requirements that only the Supreme Court can
relax.

                   Dissenting Opinion Follows  

    LIPEZ, Circuit Judge, dissenting. Under the Equal
Protection Clause of the Fourteenth Amendment, all racial or ethnic
classifications by government actors are highly suspect and will be
upheld only if they withstand strict judicial scrutiny. To meet the
strict scrutiny standard, a challenged racial classification must
serve a compelling governmental interest and must be narrowly
tailored to achieve that goal. See Adarand Constructors, Inc. v.
Pea, 515 U.S. 200, 224-25 (1995). The Boston School Committee
argues that the Boston Latin admissions program serves two
compelling interests: promoting diversity in the public schools and
remedying the vestiges of past discrimination. The majority rejects
both arguments. Although I have reservations about the Committee's
diversity argument on the facts of this case, I have none about its
remedial argument. The district court properly found that the
Boston School Committee had a strong basis in evidence for
determining that the Boston Latin admissions program serves a
compelling government interest in remedying the effects of prior
discrimination, and that the program is narrowly tailored to
achieve that goal.  
    I will explain more fully my disagreement with the
majority by dividing my opinion into four parts: a summary of the
Boston schools desegregation litigation that is particularly
relevant to the development of the Boston Latin admissions program;
a description of the proper legal framework for analyzing the
evidence of the remedial interest; an analysis of the evidence
establishing that interest; and an analysis of the program's narrow
tailoring.
                              I.
Some Relevant History
    Although the majority opinion provides an excellent
background statement placing the present dispute in perspective, I
wish to offer some additional background which more fully reveals
the antecedents of the Boston Latin admissions program in the long
history of court supervised desegregation of the Boston school
system. That court-supervised desegregation began in 1974, when the
district court found that the Boston School Committee had engaged
in "affirmative acts [which] intentionally created or maintained
racial segregation."  Morgan v. Hennigan, 379 F. Supp. 410, 427 (D.
Mass. 1974) (Morgan I). The Committee's acts included the
manipulation of facilities utilization, new school construction,
and redistricting to preserve distinctively white or minority
districts. See id. at 425-41. The district court noted that the
Committee was particularly successful in maintaining a segregated
school system through the establishment and use of "feeder
patterns" for students going from primary schools into the high
schools.  The primary schools were segregated in part because their
districts were geographically drawn and based on residentially-
segregated neighborhoods. As the high schools were far fewer in
number than the primary schools, and each high school drew on
several geographic primary school districts, the high schools might
naturally have been more racially balanced than the primary
schools. However, under the Committee's skewed feeder patterns,
students were assigned from white "junior high" schools into
predominantly white high schools beginning with the tenth grade,
and from African-American "middle" schools into predominantly
African-American high schools beginning with the ninth grade. Seeid. at 441-49. In the limited cases where students were allowed to
transfer voluntarily into schools with vacant seats, the Committee
manipulated the transfer program, alternately liberalizing it to
allow whites to transfer out of African-American schools, or
controlling it to keep African-Americans from transferring out of
African-American schools. See id. at 449-56. The district court
also found that the Committee took steps with regard to faculty and
staff assignment systemwide, and admission to the selective
citywide schools, in order to preserve the segregated status quo.
See id. at 456-69.
    Relying on the presumptive logic set forth in Keyes v.School District No. 1, 413 U.S. 189 (1973), the district court
concluded that pervasive de jure segregation throughout the Boston
public school system established a "prima facie case of unlawful
segregative design" in the examination schools. Morgan I, 379 F.
Supp. at 467, quoting Keyes, 413 U.S. at 208.  This presumption was
not rebutted. See Morgan I, 379 F. Supp. at 467-68. Although little
evidence was presented on the causes of the exam schools'
imbalanced racial composition, the court attributed part of the
disparity to the tying of admission to achievement (as opposed to
aptitude) test scores.  The court also noted that the "advanced
work classes" that prepared public school fifth and sixth graders
for the examination schools were segregated. See id. at 433, 484
n.16. On appeal, we summarized the situation as follows: "The
examination schools are segregated because black children fare
worse on the entrance examinations than whites. These children are
products of the segregated elementary classes which constituted
'tracks' to the examination schools and were more than 80%
white. . . . Thus, the segregation of the lower schools had
inevitable consequences for the examination . . . schools . . . ."
Morgan v. Kerrigan, 509 F.2d 580, 594 n.20 (1st Cir. 1974)
(affirming Morgan I).
    In the subsequent remedial phase of the desegregation
litigation, the court considered a proposal to use the SSAT, an
aptitude rather than an achievement test, as part of the admissions
process for the exam schools. This test would presumably reflect
less of the disparity in elementary education among applicants
resulting from the segregation of their schools. See  Morgan v.
Kerrigan, 401 F. Supp. 216, 243-44 (D. Mass. 1975) (Morgan II).
Although the district court also noted that there had been
discussion about using "the median score as a floor for
admissions," id. at 243, the district court declined to set an
"arbitrary" examination-score minimum for the purpose of promoting
desegregation of the examination schools, imploring the parties to
work towards solutions themselves.  Id. at 244.  The then-
Headmaster of Boston Latin School stated in an affidavit that, in
his practical experience, the median score was a good minimum
standard for selecting students able to succeed at Boston Latin.  
Id. at 243.  While the Headmaster "concede[d] that this standard
[was] an assessment based on his experience, not on racial data or
studies that would show that students scoring below that mark would
be unable to learn and succeed within the Latin schools' program,"
id., this standard was accepted by the parties and has survived to
this day as the conclusion that the top half of the applicant pool
is "qualified" to succeed at Boston Latin.
    As a remedy for its finding of discrimination by the
Boston School Committee, the court ultimately mandated that "[a]t
least 35% of each of the entering classes at Boston Latin School,
Boston Latin Academy and Boston Technical High in September 1975
shall be composed of black and Hispanic students."  Id. at 258. In
addition, the court imposed the following requirements:
    The School Department shall also institute and
    conduct programs (a) to make all students in
    the system aware of the admission requirements
    and type of instruction offered at the
    examination schools, and (b) to recruit black
    and Hispanic applicants to the examination
    schools in future years.

         Any tutorial programs given to prepare
    students for entrance examinations shall be
    conducted on a desegregated basis, as shall
    advanced work classes (if they are to be
    continued). Any enrichment and remedial
    programs for students admitted to or enrolled
    in the examination schools shall be available
    and conducted on a desegregated basis. There
    shall be no tracking of students within the
    examination schools which results in racially
    segregated classes.

Id. at 258-59. In reviewing the district court ruling, we concluded
that the 35% floor was not an impermissible racial quota because
"overall racial composition [of the system was ordered] to be used
as a starting point in designing a school desegregation plan. This
approach is specifically approved in Swann [Swann v. Charlotte-
Mecklenburg Board of Education, 402 U.S. 1 (1971)]." Morgan v.
Kerrigan, 530 F.2d 401, 423 (1st Cir. 1976) (affirming Morgan II).
    The issue of racial composition was considered especially
important in the examination schools. For most other schools in the
system, the district court set minority enrollment targets only
within a broad statistical range. The racial/ethnic composition of
any individual school was allowed a 25% deviation from the average
racial/ethnic composition of the public school system as a whole.
Such a wide margin of error was not necessary or appropriate for
citywide schools (such as the examination schools) for two
reasons. First, the practical problems of implementing more
complete desegregation in these schools were less significant than
in the non-citywide schools, where additional busing was the main
instrument for additional desegregation of neighborhood-based
schools.  Although busing posed a hardship for students who might
otherwise have attended schools near their homes, most students
attending citywide schools were already being bused to school.
Second, minority enrollment at the citywide schools had to reflect
more accurately the racial/ethnic composition of the system because
the citywide schools were viewed as valuable vehicles for voluntary
desegregation that could not have "[s]ignificant departures" from
the overall composition and still attract students seeking an
integrated learning environment. See 530 F.2d at 423. The target
figure for overall African-American/Hispanic levels at the exam
schools, 35%, was set slightly lower than the percentage of
African-Americans and Hispanics in the system as a whole because
there was a significant population of Asians at the exam schools
already, bringing total levels of "black and other minority"
enrollment closer to the 44% rough target set for other citywide
schools. See Morgan II, 401 F. Supp. at 244.
    In 1987, some twelve years after the initial court
desegregation orders, we held that court supervision of student
assignments in the Boston schools should end in light of the
Committee's good faith, the State Board's findings of compliance,
and the general notion that the maximum practicable level of
desegregation had been achieved (given the impact of factors
exoteric to School Committee control, such as white flight). Morganv. Nucci, 831 F.2d 313 (1st Cir. 1987) (Nucci). In deference to the
longstanding national tradition of local school autonomy, control
over the student assignment process was returned to the Boston
School Committee, with the express reservation that "'unitariness'
... in all aspects of the Boston schools has not yet been
achieved."  Id. at 318. Finally, in 1994 the district court issued
a "Final Judgment" in the Morgan litigation, and "permanently
enjoined" the Committee "from creating, promoting or maintaining
racial segregation in any school or other facility in the Boston
Public school system." Morgan v. Burke, Civil Action 72-911G, (D.
Mass. July 19, 1994), at 5 (Morgan IV).
    The School Committee voluntarily continued the 35%
African-American/Hispanic set-aside at the exam schools even after
this policy ceased in 1987 (with Nucci) to be a court mandate. In
1996, however, the set-aside effectively ended with McLaughlin v.
Boston School Committee, when the district court issued a
preliminary injunction ordering the admission to Boston Latin of a
student who challenged the set-aside's constitutionality. 938 F.
Supp. 1001 (D. Mass. 1996). In making that ruling, the court
acknowledged that
    the set aside had its origins in a court-
    ordered desegregation plan; that it had
    already played a crucial and successful role
    in desegregating the once virtually all-white
    examination schools; that the First Circuit
    had in no way called its validity into
    question in returning to the [Boston School
    Committee]control over student assignments;
    and that the appeals court had, if anything,
    strongly hinted that in-place corrective
    measures ought to be continued. Indeed, it may
    not be too much of a stretch to say that,
    without the set aside, there would not have
    been a finding of unitariness with respect to
    student assignments at all.

Id. at 1016. The court then warned that "abandonment of the 35% set
aside at the present time without adopting other remedial measures
would, within the next six years or sooner, convert BLS into an
overwhelmingly white and Asian-American school with a black and
Hispanic enrollment of about 15%." Id. at 1008.  
    Nonetheless, the district court found a likelihood of
success for the disappointed white applicant Julia McLaughlin on
the narrow tailoring aspect of her challenge to the admissions
program. The district court cited the fact that "the set aside
still does not have a built-in termination provision." Id. at 1016.
It also noted that the Boston School Committee did "not appear to
have explored the feasibility of less racially preferential plans
for keeping BLS [the Boston Latin School] accessible to 'qualified'
students of all races and ethnicities, and not just to those
students who, for a myriad of reasons, tend to excel on
standardized examinations at the tender age of 12," even though
"such plans may well be available for defendants' consideration."  
Id. The court offered as one possible alternative to the rigid 35%
set-aside a periodically updated target for minority enrollment,
with "percentages [tailored] to the relevant qualified applicant
populations."  In light of the preliminary injunction, the
Committee replaced the set aside, and the district court's
suggestion of a floating target was influential in molding the set-
aside's immediate replacement, the current admissions program.
                             II.
The Legal Framework for an Analysis of the Evidence
    In rejecting the district court's conclusion that the
School Committee's current admissions program for Boston Latin
"appropriately addressed the vestiges of discrimination that linger
in the Boston Public School system," Wessmann v. Boston School
Committee, 996 F. Supp. 120, 131 (D. Mass. 1998), the majority
asserts that the School Committee failed to present satisfactory
evidence of a causal connection between the achievement gap
documented by the Committee and the prior de jure segregation of
the Boston schools. I disagree with this conclusion. In my view,
the majority judges the Committee's proof of causation
unsatisfactory because the majority misperceives the Committee's
evidentiary burden in defending its affirmative action program.
That point requires some elaboration.
    The law is clear that a public entity adopting an
affirmative action program to remedy the lingering effects of past
discrimination must have a "strong basis in evidence" for
concluding that the lingering effects it identifies are causally
linked to past discrimination. See City of Richmond v. J.A. Croson
Co., 488 U.S. 469, 500 (1989) (quoting Wygant v. Jackson Bd. of
Educ., 476 U.S. 267, 277 (1986) (plurality opinion)).  The more
elusive question is what factual predicate constitutes a "strong
basis in evidence" justifying action by the public entity. From my
reading of the relevant caselaw, I conclude that this "strong
basis" requirement is met preliminarily if the public entity whose
affirmative action program is challenged in court demonstrates that
the entity adopted the program on the basis of evidence sufficient
to establish a prima facie case of a causal link between past
discrimination and the current outcomes addressed by the remedial
program. If this prima facie case is not effectively rebutted by a
reverse discrimination plaintiff, the public entity has met its
burden of establishing a compelling remedial interest. I now turn
to an analysis of the cases.
    There are no educational context reverse-discrimination
opinions from the Supreme Court which give us authoritative
guidance on what constitutes a strong basis in the evidence
sufficient to warrant remedial action. Contrary to the view of the
majority, I think it is appropriate to look to analogous cases from
the employment context. In that context, the Supreme Court has
required that  
    a public employer . . . must ensure that,
    before it embarks on an affirmative-action
    program, it has convincing evidence that
    remedial action is warranted. That is, it must
    have sufficient evidence to justify the
    conclusion that there has been prior
    discrimination.
  
    Evidentiary support . . . becomes crucial when
    the remedial program is challenged in
    court. . . . In such a case, the trial court
    must make a factual determination that the
    employer had a strong basis in evidence for
    its conclusion that remedial action was
    necessary. . . .  [U]nless such a
    determination is made, an appellate
    court . . . cannot determine whether the race-
    based action is justified as a remedy for
    prior discrimination.

Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277-78 (1986)
(Powell, J., plurality opinion) (emphasis added). In his earlier
opinion in Bakke, Justice Powell (joined by no other Justices on
this point) had stated that a "judicial, legislative or
administrative" finding of prior discrimination was an absolute
precondition to establishing a remedial program. Regents of the
Univ. of California v. Bakke, 438 U.S. 265, 307-09 (1978).  
Concerned that this requirement of a prior finding might be read
into Justice Powell's opinion in Wygant, Justice O'Connor wrote in
her concurring opinion in Wygant that "a contemporaneous or
antecedent finding of past discrimination by a court or other
competent body is not a constitutional prerequisite to a public
employer's voluntary agreement to an affirmative action plan."
Wygant, 476 U.S. at 289 (O'Connor, J., concurring). Although it may
seem excessively semantic to distinguish between the prerequisite
of a court or other competent body's contemporaneous or antecedent
finding of past discrimination to justify a voluntary affirmative
action program, and the lesser prerequisite of a public entity's
strong basis in evidence for concluding that such remedial action
is necessary, there is actually much at stake in that distinction.
As Justice O'Connor noted in her concurrence in Wygant:
    ...[P]ublic employers are trapped between the
    competing hazards of liability to minorities
    if affirmative action is not taken to remedy
    apparent employment discrimination and
    liability to nonminorities if affirmative
    action is taken. Where these employers, who
    are presumably fully aware both of their duty
    under federal law to respect the rights of all
    their employees and of their potential
    liability for failing to do so, act on the
    basis of information which gives them a
    sufficient basis for concluding that remedial
    action is necessary, a . . . requirement [that
    they have a court's actual finding of their
    own past discrimination before they act]
    should not be necessary.

Wygant, 476 U.S. at 291 (O'Connor, J., concurring). This concern
for the vulnerable position of a public entity with a remedial duty
led Justice O'Connor to conclude that such an entity should not
have to wait for its own liability to minorities to be proved
conclusively in litigation before it could undertake remedial
action.  
    These concerns were again reflected in Justice O'Connor's
concurrence in Johnson v. Transportation Agency, 480 U.S. 616
(1987). In Johnson, the Court upheld a voluntary affirmative action
program instituted by a local transportation agency. The program
allowed, inter alia, the agency to consider gender as a factor in
the applicant's qualifications for employment.  In her concurrence,
Justice O'Connor noted that "[w]hile employers must have a firm
basis for concluding that remedial action is necessary . . .  
Wygant . . .  [does not] place[] a burden on employers to prove
that they actually discriminated against women or minorities." Id.at 652 (O'Connor, J., concurring). She explained that an employer
would have a firm basis in the evidence, sufficient to justify
remedial action, "if it can point to a statistical disparity
sufficient to support a prima facie claim under Title VII by
employee beneficiaries of the affirmative action plan of a pattern
or practice claim of discrimination." Id. at 649.  
    Justice O'Connor incorporated these standards from her
Wygant and Johnson concurrences into an opinion for a majority of
the Court only a few years later in City of Richmond v. J.A. Croson
Co., 488 U.S. 469 (1989). In Croson, the Court invalidated a
minority subcontracting preference voluntarily instituted by the
city of Richmond because the city had not shown "any identified
discrimination in the Richmond construction industry." Id. at 505.
Justice O'Connor stated that the city had failed to justify its
remedial goals with a "'strong basis in evidence.'" Id. at 500
(citation omitted). The city had produced "nothing approaching a
prima facie case of a constitutional or statutory violation by
anyone in the Richmond construction industry" sufficient to justify
the city's use of subcontracting preferences to remedy its own role
in perpetuating that discrimination. Id. ( III-B, opinion of the
court) (emphasis added). If the city had presented evidence
supporting a prima facie claim under Title VII by the minority
subcontractors, remedial action would have been warranted. In the
absence of this evidence, the preference was an illegitimate racial
classification.
    In Stuart v. Roache, 951 F.2d 446 (1st Cir. 1991), cert.
denied, 504 U.S. 913 (1992), we relied on Croson in discussing the
burden of proof required of a public entity to justify a voluntary
affirmative action plan giving minority police officers a
preference in promotion to sergeant. We stated that "[a] majority
of the Supreme Court in Croson used the words 'strong basis' and
'prima facie case' in [the context of voluntary race-conscious
remedial action by a public entity.] Hence, that is the evidentiary
standard that we use." 951 F.2d at 450 (citing Croson, 488 U.S. at
500, and Wygant, 476 U.S. at 292). We noted in Stuart that the
presence of statistical disparities creating a prima facie case "at
least casts doubt on the fairness of the promotion process and
requires further explanation" by the reverse-discrimination
plaintiff. 951 F.2d at 451. To elaborate on this last statement,
we cited partially to this section of Justice O'Connor's
concurrence in Wygant:
    [A] public employer must have a firm basis for
    determining that affirmative action is
    warranted. . . . For example, demonstrable
    evidence of a disparity [between percentages
    of minorities on a staff and in a] relevant
    labor pool sufficient to support a prima facie
    Title VII pattern or practice claim by
    minority teachers would lend a compelling
    basis for a competent authority such as the
    School Board to conclude that . . . a
    voluntary affirmative action program is
    appropriate . . . .

         To be sure, such a conclusion is not
    unassailable.  If a voluntary affirmative
    action plan is subsequently challenged in
    court by nonminority employees, those
    employees must be given the opportunity to
    prove that the plan does not meet the
    constitutional standard this Court has
    articulated. However, as the plurality
    suggests, the institution of such a challenge
    does not automatically impose upon the public
    employer the burden of convincing the court of
    its liability for prior unlawful
    discrimination;  nor does it mean that the
    court must make an actual finding of prior
    discrimination based on the employer's proof
    before the employer's affirmative action plan
    will be upheld . . . .  In "reverse
    discrimination" suits, as in any other suit,
    it is the plaintiffs who must bear the burden
    of demonstrating that their rights have been
    violated....[W]hen the Board introduces its
    statistical proof as evidence of its remedial
    purpose, thereby supplying the court with the
    means for determining that the Board had a
    firm basis for concluding that remedial action
    was appropriate, it is incumbent upon the
    nonminority teachers to prove their case;  
    they continue to bear the ultimate burden of
    persuading the court that the Board's evidence
    did not support an inference of prior
    discrimination and thus a remedial purpose[.]

Wygant, 476 U.S. at 292-93 (O'Connor, J., concurring).
    Justice O'Connor's concurrence in Wygant, relied upon by
us in Stuart, provides a clear statement of the strong basis in
evidence required of a public entity defending an affirmative
action employment program in court: if minority beneficiaries of a
voluntary program could, in the program's absence, have met the
initial burden of production in a Title VII pattern-or-practice
suit (a "prima facie case") on the basis of the evidence relied
upon by the public entity, then the entity is justified in
preemptively enacting a voluntary remedial affirmative action
program. Put another way, the "strong basis in evidence" required
of a government entity defending an affirmative action employment
program in court is comparable to the evidentiary burden imposed on
a minority plaintiff who makes a claim of a pattern or practice of
employment discrimination under Title VII. Both must meet the
standard for a prima facie case. In the reverse discrimination
context, however, the public entity defending a challenge to its
affirmative action employment program in court does so by
presenting the evidence of a prima facie case of discrimination
that a putative Title VII minority plaintiff might have presented
in a potential lawsuit.
    I must pause in this discussion of the relevant
employment discrimination case law to make two points which are
important to an understanding of the evidentiary burden of the
School Committee. The School Committee asserts that evidence of
differential success rates for African-American and Hispanic
students applying to the examination schools from the advanced work
classes in the Boston Public Schools, as compared to their white
and Asian classmates, and evidence that African-American and
Hispanic students apply to the examination schools at half the rate
of white and Asian students, without more, constitute a "strong
basis in evidence" sufficient to justify a remedial affirmative
action program. In its amicus brief, the NAACP asserts that
statistical evidence of the discriminatory effects of overreliance
at the exam schools on composite score as a basis for admission,
without more, provides a strong basis in evidence sufficient to
justify a remedial affirmative action program.  Both of these
disparate impact contentions are wrong because they do not account
for the centrality of proof of discriminatory animus in justifying
a race-conscious remedial program. That centrality accounts for
Justice O'Connor's reference to the strong basis in evidence
provided for race-conscious remedial action by a prima facie Title
VII pattern or practice claim. Unlike Title VII disparate impact
claims, Title VII pattern or practice claims require evidence of
discriminatory animus. In addition to providing evidence of
disparate impact as part of its strong basis in evidence for
remedial relief, the reverse discrimination defendant must link
that disparate impact to discriminatory animus, whether recent, or,
as asserted in this case by the School Committee, rooted in a more
distant history of discrimination.
    In the Supreme Court employment cases I have discussed,
the reverse discrimination defendant sought to establish that its
affirmative action program was necessary to remedy harm caused by
recent discrimination. The disadvantaged plaintiff challenged the
existence of the discrimination itself, not whether that
discrimination had actually harmed minorities. In response to that
challenge to the existence of the discrimination itself, Justice
O'Connor made the point in Wygant and Johnson that the public
employer did not have the burden of convincing the court of its
liability for prior unlawful discrimination, nor did the court have
to make a finding of prior discrimination based on the employer's
proof to uphold the affirmative action program. Instead, the public
employer only had to demonstrate that it had a strong basis in
evidence for concluding that there was prior discrimination. Prima
facie evidence of a Title VII pattern or practice claim that could
be brought by minority plaintiffs would be such evidence.
    In the instant case, where there is a long history of
court findings of discriminatory acts by the School Committee,
there is no dispute about the public entity's responsibility for
prior discrimination.  Instead, given the time lapse between those
court findings of discrimination and the claim that this
discrimination still disadvantages minorities, the issue in dispute
here is whether the vestiges of that prior discrimination now
affect minorities.  This showing necessarily requires evidence of
the existence of vestiges of the prior discrimination and of a
present harm to minorities.  It also requires evidence of causal
connections between the past discrimination and the claimed
vestiges, and between the vestiges and the present harm.  Through
these connections, the School Committee must show that the need for
remedial action was a consequence of the effects of past
discrimination.  Nevertheless, Justice O'Connor's strong basis in
evidence/prima facie analysis still defines the evidentiary burden
of the School Committee in presenting its proof of the causal
relationship between prior discrimination and the present effects
on minorities.
    The district court in the McLaughlin case recognized the
applicability of Justice O'Connor's evidentiary framework:
    [W]hile the party seeking to justify an
    affirmative action measure here the defendant
    BSC [Boston School Committee] defending use of
    the 35% set aside bears the initial burden of
    producing "a strong basis in evidence" in
    support of the measure, the "ultimate burden"
    of proof rests with the party challenging it
    to prove that it is unconstitutional. [citing
    Wygant] . . . [T]he burden on the BSC is
    merely one of production: it must demonstrate
    that there is "a strong basis in evidence for
    [its] conclusion that remedial action was
    necessary." [citing Concrete Works of Colo. v.
    Denver, 36 F.3d 1513, 1521-22 (10th Cir.
    1994)].  If it does so, the ultimate burden of
    proving that the evidence before the BSC did
    not reasonably support an inference of prior
    discrimination . . . rests with the plaintiff.

McLaughlin, 938 F. Supp. at 1010. In the instant case, the Boston
School Committee had the burden of demonstrating to the court that
the evidence that impelled it to adopt the admissions program for
Boston Latin met the prima facie standard set forth by Justice
O'Connor in Wygant, Johnson and Croson and applied by us in Stuart:
that is, the Committee had to show that the evidence before it
would constitute a prima facie case of a constitutional or
statutory violation if brought by a putative minority plaintiff. If
this prima facie case was not effectively rebutted by Wessmann, who
always retains the burden of persuasion, the School Committee
prevails.
    The majority finds the School Committee's reliance on
cases addressing affirmative action plans designed to remedy
vestiges of past employment discrimination inapt.
    In this case, the "barrier to entry"
    comparable to those in the employment
    discrimination cases is BLS's requirement of
    an entrance examination and the resultant
    composite score and no one (least of all, the
    School Committee) claims that the examination
    or any component thereof is discriminatory in
    operation or effect, or that it would be
    discriminatory if it were used as the sole
    criterion for admission. Such a claim was
    central to our conclusion in Stuart, 951 F.2d
    at 451, and it is totally absent here. What is
    more, such a claim would make precious little
    sense in the context of the School Committee's
    argument, for standardized achievement tests
    (a component of the entrance examination) are
    the primary measure of the asserted
    achievement gap.

I disagree with this analysis. Precisely as in the employment
cases, there is an identifiable barrier to entry that could be
challenged by minority applicants in the event the race-conscious
aspects of the Boston Latin admissions program were elided. Amicus
curiae NAACP makes this claim on appeal; it tried doggedly to
intervene below; and its position explains why the School Committee
could not, in the context of litigation both current and
anticipated, freely admit that composite score ranking may have had
a discriminatory impact if used alone. Despite this constraint,
the School Committee did allude to the notion of discriminatory
impact, as already noted, and there was evidence presented at trial
that, for African-Americans and Hispanics, composite score was not
reliably correlated with future performance at BLS. The Committee
also took pains to indicate that its stipulation at trial that
Wessmann would have been admitted had a straight-rank-order system
been used was not a concession that such an admissions scheme was
acceptable.
    Although the admissions program challenged here was
"voluntary," in the sense of not being impelled by the 1994 order
or any other court proceeding or consent decree, the mere act of
making a selection among students seeking admission to Boston Latin
exposed the Committee to legal action by minority students. As
Justice O'Connor characterized the analogous employment situation,
"public employers are trapped between the competing hazards of
liability to minorities if affirmative action is not taken to
remedy apparent employment discrimination and liability to
nonminorities if affirmative action is taken." Wygant, 476 U.S. at
291 (O'Connor, J., concurring). The Wygant case dealt with racial
preferences in employment, an arena where the shadow of Title VII
suits by disappointed minority job seekers inevitably looms over a
public employer using selection criteria with the potential to
produce an unjustifiable "disparate impact" on minorities. The same
considerations apply in the context of a selective public secondary
school: the mere act of selection exposes the school system to
challenge from minorities based on the disparate impact of the
selection criteria used. Here, the relevant provision of federal
law is Title VI of the Civil Rights Act of 1964, 42 U.S.C.  2000d
(West 1998), stating that "[n]o person in the United States shall,
on the ground of race, color, or national origin, be excluded from
participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal
financial assistance."
    There was evidence produced at trial that any exclusive
focus on composite score in admissions had a disparate impact on
African-Americans and Hispanics. Although the ability of minority
plaintiffs to make colorable claims of Title VI violations would
not be sufficient to justify a race-conscious affirmative action
program (such claims would only be sufficient to force the
Committee to find some alternative to composite score rank order
admissions), the presence of the disparate impact underlying such
claims, when causally related to the history of de jure segregation
in the system, imposed on the School Committee a duty to ensure
that it did not violate the Constitution by using selection
criteria that perpetuated the effects of past governmental
discrimination. As already noted, the district court in McLaughlinwas skeptical of the legality of simply reverting to the use of
composite score ranking, stating just two years ago that
"abandonment of the . . . set aside at the present time without
adopting other remedial measures would, within the next six years
or sooner, convert BLS into an overwhelmingly white and Asian-
American school . . . ." 938 F. Supp. at 1008 (emphasis added).  
The Committee chose a remedial measure for admission to the Boston
Latin School in the wake of a long history of desegregation orders
and under the threat of Title VI suits by disappointed minority
applicants if no affirmative action were taken.
    Just as the courts have always encouraged consensual
resolutions to desegregation cases, Congress' intent to encourage
voluntary compliance with the requirements of Title VI (and VII,
for that matter) has always been a backdrop to the scheme of
evidentiary burdens the federal courts have placed on litigants
pursuant to that legislation. See Bakke v. Regents of the Univ. of
California, 438 U.S. 265, 336 (1978) (Brennan, White, Marshall, and
Blackmun, JJ., concurring in part) (Title VI); Johnson v.
Transportation Agency, 480 U.S. 616, 630 n.8 (1987) (Title VII).
Similarly, in cases where there may be a duty to counteract the
effects of past government discrimination, the Supreme Court has
set evidentiary standards that facilitate a voluntary remedy. A
government entity need not admit conclusive guilt for past
discrimination's current effects before going forward with a
remedial plan. Instead, it must satisfy the court that the evidence
before it established a prima facie case of a causal link between
past discrimination and the current outcomes addressed by the
remedial program. If this prima facie case is not effectively
rebutted by a reverse discrimination plaintiff, who always retains
the burden of proving the illegality of the affirmative action
program, the government has met its burden of establishing a
compelling remedial interest under strict scrutiny analysis. With
this legal framework in mind, I turn to an analysis of the evidence
on the vestiges of discrimination.
                             III.
The Evidence on the Vestiges of Discrimination
    The district court found that "[t]he overwhelming
evidence presented at trial confirmed the Boston School Committee's
basis for concluding that remedial action was necessary . . . ."
996 F. Supp. at 131.  The majority says we should exercise plenary
review of that decision, "taking the statistical and anecdotal
evidence in the manner suggested by the School Committee."  I agree
with the majority's approach.  I disagree with its conclusion.
1. The Achievement Gap
    The evidence at trial revealed large gaps between African-
Americans and Hispanics, on the one hand, and whites and Asians, on
the other, in admissions to the exam schools, and in achievement
and allocation of resources throughout the system. The most
significant of these is the persistent, static gap in achievement
between African-American and Hispanic students and white and Asian
students. The gap is measured by achievement test scores of fifth
and sixth graders on the Metropolitan Achievement Test and the
Stanford 9.  Expert witness analysis of the test results over a
several year period showed a persistent and relatively unchanging
gap in achievement in all subject matters which correlated with
race: African-American and Hispanic students fared much worse on
the tests than whites. The tests also revealed that, in general,
Asians fared worse than whites on language skills achievement.   
    The evidence also demonstrated that African-Americans and
Hispanics from the public schools apply to the examination schools
at half the application rate of other students in the public
schools. Even within the special advanced work classes which are
designed to prepare Boston public elementary school students for
the examination schools, African-Americans and Hispanics fared
worse in the examination schools' admissions process than whites.
Finally, there was evidence that African-American and Hispanic
applicants to Boston Latin from private elementary schools do much
better in the admissions process than their Boston public school
counterparts. The existence of these "gaps" was undisputed at the
trial.   
2. The Relationship of the Achievement Gap to Prior Discrimination
    The Committee presented evidence of a connection between low
teacher expectations for minority students and low minority
performance on achievement tests.  The Committee presented further
evidence that these low teacher expectations for minority students
are prevalent in the Boston school system, and that this prevalence
is a vestige of the long years of segregation in the Boston school
system.  Given these connections between student achievement,
teacher expectations for students, and the impact of years of
segregation on these teacher expectations, the achievement gap
itself is a current and lingering effect of discrimination.  I will
now summarize the evidence on these connections.
(a) The connection generally between teacher expectations and
student performance
    Both Dr. William Trent and Deputy Superintendent Janice
Jackson testified that teacher expectations affected student
performance. Dr. Trent gave extensive testimony concerning the
research he performed for the Kansas City School District in
connection with the school's efforts to determine whether it had
remedied the vestiges of prior segregation in compliance with a
court order.  In this study, Dr. Trent relied upon "climate
surveys" comprehensive questionnaires distributed to teachers,
students and parents to evaluate and score teacher efficacy.  He
explained that teacher efficacy measures "the sense that teachers
perceived themselves or their colleagues as able to make a
difference in their teaching activities, their perceptions that
their schools operate with a sense of fairness, that they have a
high regard for their students and student body, [and] that they
perceive their school as open and accessible. . . ."   A higher
efficacy score indicated that the teachers considered themselves
able to make a difference in their teaching activities and that
they held their students in high regard.  The Kansas City study
showed that there was a correlation between high teacher efficacy
scores and higher student test performance, while low teacher
efficacy scores were associated with low student test performance.
     Deputy Superintendent Jackson also testified that teacher
expectations affect student performance.  Early in Jackson's career
she was specifically trained in TEASA (Teacher Expectations and
Student's Achievement) techniques.  TEASA's techniques were derived
from studies demonstrating that interactions of teachers with
students can convey whether the teachers believe that the students
are capable of performing at a high level.  Specifically, the
techniques attempt to focus the teachers on their unconscious
biases about low and high achievers, including how their racial
attitudes influence their expectations of the students.  For many
years, Jackson instructed teachers on these techniques and
conducted countless training sessions to demonstrate how teachers'
interactions with students, even at an unconscious level, can have
a significant impact on student performance.
    Superintendent Thomas Payzant echoed Trent's and Jackson's
statements: "My experience is that if you set high expectations for
a student, they will try harder to reach the higher bar than if you
set low expectations where they will tend to be content that they
have met what they are expected to do and should be satisfied with
their accomplishment."
(b) Low expectations for minority students in the Boston School
System
    Deputy Superintendent Jackson described her numerous
opportunities to observe the interactions among students, teachers
and administrators in the Boston public schools. In fact, Jackson
testified that she observed between thirty and forty Boston public
schools in her first year as Deputy Superintendent and at least
another forty schools in the system her second year.  During these
classroom visits, she observed that teachers had different
expectations for the African-American and Hispanic children versus
the Asian and white children.  She saw incidents of unjustified
disciplinary action directed at minority students, and noted a
frequent failure of teachers to call upon African-American and
Hispanic students in class. She also saw recurring instances of
teachers withholding praise for minorities and treating them with
condescending laxity when calling upon them in class.  
    Noting the substantial disparity in the application rates of
African-American and Hispanic students compared with white and
Asian students to Boston Latin School, Dr. Trent connected these
low expectations for minority students described by Jackson to the
minority students' low test performance and low admissions rate at
the examination schools. Dr. Trent explained that "[t]o the extent
teachers play a central role in encouraging and preparing students
to apply for one of the more valued resources in the Boston Public
Schools, [the difference in application rates] reflects a very
different rate of success with encouraging or facilitating black
and Hispanic students applying, in contrast to the rate at which
white and Asian students do." He elaborated on this point:  
         Based, again, on the commentary reported and
    recorded by Deputy Jackson in her deposition, and my
    interviews, and on the pattern of applicant disparity, as
    well as looking at the data in terms of the generation of
    applicants, and there's chartered information that shows
    the same schools, for example, that generate substantial
    numbers of white and Asian applicants are not as
    successful with generating comparable numbers or rates of
    applicants for black and Hispanic students.
 
         These suggest patterns of differential treatment or
    encouragement, or success, at least, with those black
    students, some of which is likely attributable to
    differential expectations, particularly within the
    commentary of the headmasters and the principals of the
    schools I had an opportunity to visit.

(c) Low expectations for minority students as a vestige of prior
discrimination
     Dr. Trent provided the primary evidence on the causal link
between prior discrimination and low teacher expectations for
minority students and the effect of these low expectations on the
achievement gap. Dr. Trent tied these low expectations to the
lingering effects of a segregated school system.  He explained: "It
appears that in the seniority ranks, as many as 28.4 percent of the
teachers currently employed in the district have been with the
district since prior to 1973, and about 47 percent have been with
the district from 1980 and prior."  These numbers indicated to Dr.
Trent that many of the teachers' attitudes towards their students
and expectations of them were shaped in a segregated school system.
Dr. Trent explained the difficulty of changing such teacher
attitudes following a desegregation order:  
         . . . [A]n organizational theory in research
    suggests that organizational change and organizational
    stability, particularly the climate of attitudes and
    dispositions within organizations, is a critical feature,
    and that generally recruitment hinges on socializing new
    members into the existing culture of the organization. So
    to the extent that there is this kind of faculty
    seniority and tenure in the district, we could be seeing
    the persistence of particular attitudes that predate or
    at least were shaped and developed during the period of
    intense contestations regarding the desegregation of the
    schools [in Boston]. And to the extent that there is
    little change, effort, professional development, and
    other sorts of efforts that would address those
    prevailing attitudes, you could have a persistence of
    those attitudes and the socialization of new individuals
    into those existing cultures.
  
         School desegregation research has shown the
    importance of changing the composition of the makeup of
    the schools, the racial composition of faculty, and the
    importance of changing leadership, as well as providing
    professional development experiences in order to
    facilitate greater success with the desegregation effort.

Based on his interviews with school personnel, Dr. Trent testified
that there was no evidence that the school system had been
successful in counteracting the diminished expectations for
minority students.
    As noted by the majority, Dr. Trent did not conduct a specific
study of the Boston school system, as he had done for the Kansas
City School District, to evaluate whether teachers had different
expectations for minority students and whether those low
expectations were attitudinal remnants of the segregation era. In
lieu of such a study, Trent relied on the seniority statistics
discussed above as well as statistics relating to the different
student application rates to the exam schools, indicating a
substantial disparity between the application rates of African-
Americans and Hispanics compared to whites and Asians. He also
relied on statistics that show that African-American and Hispanic
students attending the Boston public schools receive invitations to
attend Boston Latin at a much lower rate than do African-Americans
and Hispanics attending private schools, whereas the invitation
rates for white and Asian private school and white and Asian public
school students were comparable. Finally, he relied on interviews
with headmasters, principals and other personnel, as well as an
interview with Deputy Superintendent Janice Jackson, who, as noted,
had special training in observing teacher interactions with
students, and had made a personal survey of over seventy schools in
the Boston school system over the course of two years.  Based on
this information, he offered his expert opinion that low teacher
expectations for minorities, shaped in the segregation era, are a
cause of the current achievement gap, and thus the achievement gap
itself is a vestige of discrimination.
    Superintendent Payzant also testified to vestiges of prior  
discrimination in the school system. He first explained that, prior
to 1973, there were  
    specific practices in the school district that resulted
    in students being assigned to schools that often led to
    particular races being represented in some schools and
    not others, practices that resulted in resources being
    unequally distributed so that there were disparities
    among the schools, disparities among the programs that
    were offered and the access and opportunity that students
    had to them . . . .

         . . . .

         And I cite that because I think the institutional
    history of the school district prior to 1973 was shaped
    by those practices.  And as I testified a moment ago,
    there is a significant percentage of teachers and other
    educators in the Boston Public Schools who really were
    socialized and shaped by the expectation that the
    institution had in the pre-1973 period.  

He further explained the significance of this "socialization" in
the pre-1973 period: "[W]hat was going on [pre-1973] was part of
what people saw as their normal working conditions and they learned
to function in those settings and, whether consciously or
unconsciously, accepted the practices that were occurring in many
instances."  He noted that  
    there was a disparity in terms of allocation of
    resources, access to programs, variation in quality from
    school to school, . . . [and] the result was that some  
    students were getting a higher quality education than
    others and often that was defined by race, and that was
    part of the background with respect to expectations that
    were set for what students could or could not do.

    Robert Gittens, Vice-Chair of the Boston School Committee,
also testified that the effects of segregation and prior
discrimination permeated the school system despite its efforts to
remedy the problem. He explained that he was often in contact with
African-American parents who complained of being alienated from the
school system. They also complained that their children were not
being motivated or challenged academically.  He noted, however,
that he did not hear these complaints from white parents.  He
further stated:  "We have schools today that are overwhelmingly
black and Hispanic[.]  I believe that there is a pervasive sense
that there are kids in the system who cannot, will not . . .
succeed."  He elaborated:  
    I think that one of the things that has happened is we
    have a teaching force that has been in the system for a
    very long period of time.  And I think that there are
    large numbers of teachers who, and I've heard this from
    headmasters and principals and others, that there are
    teachers who say, "I've been teaching this way for 20 or
    25 years.  Why should I change the way I teach?"

3. A prima facie case of causation
    The majority's criticisms of the Committee's evidentiary case
are twofold: 1) the Committee did not establish the presence of
differential teacher exceptions for minority students and 2) the
Committee failed to establish any causal connection between prior
discrimination and the achievement gap itself; that is, it failed
to establish that prior discrimination affected low teacher
expectations for minority students and further failed to establish
that these low expectations were a cause of the achievement gap. I
respond to these criticisms in turn.
    The majority asserts that Dr. Trent's failure to conduct a
survey of the type conducted in Kansas City disabled him from
validly establishing that teachers had different expectations for
minority students.  Specifically, the majority criticizes Dr.
Trent's reliance on "anecdotal" evidence about teacher attitudes
supplied by school officials rather than the broad survey of
teachers in Kansas City.  Used pejoratively, the word "anecdotal"
describes accounts of isolated instances few in number. Used
descriptively, the word describes observational testimony that
could embrace many instances of a phenomenon.  We should be wary of
dismissing as "anecdotal" the extensive observational accounts of
experienced school administrators testifying about the prevalence
of different teacher expectations in their school systems,
particularly when, as in the case of Deputy Superintendent Jackson,
the administrator is trained to make such observations.
    Jackson had observed a large variety of classrooms before her
work in the Boston schools. As a result, her observations of over
seventy schools in the Boston school system over a two year period
were made within a broader frame of reference than those of the
individual teachers, students, and parents responding to the
surveys relied on by Dr. Trent in his Kansas City survey. Jackson's
extensive training in making such observations would allow her to
notice nuanced behavior that survey respondents would not have
discerned.  While the risk that the personal bias of the observer
will infect the results is greater when relying on data filtered
through a few observers, as opposed to data reported on paper by a
large number of survey respondents, Jackson was trained to make her
observations in a professional, objective manner.  Observations of
wide scope, reported by parties with training in methods of
objective observation, do permit generalization about "pervasive,"
"systematic" problems.
    The majority opinion and the concurrence contend that there is
a similarity between the evidence relied upon by the School
Committee and the evidence found inadequate by the Supreme Court in
Croson. I find this analogy unconvincing.  In Croson, there was no
evidence of local, industry-specific discrimination beyond the
statements of one councilperson to the effect that he was "familiar
with the practices in the construction industry in this area," and
that in his experience "the general conduct of . . . the industry
. . . is one in which race discrimination and exclusion on the
basis of race is widespread." Id. at 480. Such a vague
generalization led the Court to conclude that "none of the evidence
produced by the city points to any identified discrimination in the
Richmond construction industry." Id. at 506. In this case, the
testimony of Trent, Jackson and others on the achievement gap, low
teacher expectations for minorities, and the causal connection to
prior discrimination in the Boston public schools was based on
extensive observations by skilled professionals of the conduct and
performance of students and teachers in the Boston schools, as well
as statistical evidence specific to those schools.
    The majority also asserts that "Dr. Trent thus freely conceded
that the data he used [on teacher expectations] was not of the
quality necessary to satisfy the methodological rigors required by
his discipline."  I do not find this concession in Dr. Trent's  
testimony. In fact, during cross-examination, in response to a
question concerning whether it was reasonable for him to rely on
Deputy Superintendent Jackson's assessments of teacher expectations
in the Boston school system, Dr. Trent responded: "In many
instances in the social sciences, qualitative researchers work with
information that is reported by the respondents. That is not
unusual."  Although a survey of teachers and other personnel in the
Boston school system would have provided a more substantial basis
for Dr. Trent's opinion on the existence of low teacher
expectations for minorities, the absence of such empirical data
does not justify the majority's rejection of his testimony.   
    I also disagree with the majority that Trent's testimony
relied on "evidence from one locality to establish the lingering
effects of discrimination in another" in the manner criticized in
Croson.  Dr. Trent's expertise in identifying patterns of vestigal
effects of discrimination necessarily was acquired through his
prior studies of other school systems, including Kansas City.  He
did not attempt to use national statistics or statistics from other
localities to infer the existence of similar local conditions, as
was done by the city council in Croson.  See Croson, 488 U.S. at
504.
    The Committee's evidence on the connection between prior
discrimination and low teacher expectations, and low teacher
expectations and the achievement gap, was undeniably a mix of
statistical and anecdotal evidence. Although the majority finds
this mix unacceptable, courts have often held that statistical
evidence documenting a disparate impact or a pattern or practice of
disparate treatment can combine with anecdotal evidence of acts of
discrimination to establish a prima facie case of discrimination.  
    In International Brotherhood of Teamsters v. United States,
431 U.S. 324, 334-38 (1977), statistical evidence on outcome
(namely, the low number of minority truck drivers compared to the
relevant qualified pool) was supported by individual testimony on
prior discrimination (over forty acts of explicit discrimination
against minority aspirants). These testimonials "brought the cold
numbers convincingly to life."  Id. at 339. In Coral Construction
Co. v. King County, 941 F.2d 910, 919 (9th Cir. 1991), cert.
denied, 502 U.S. 1033 (1992), the Ninth Circuit warned of the
dangers of relying overly on either statistics or anecdotal
accounts, individually, to establish a widespread pattern of
discrimination.  Nonetheless, the court found that "the combination
of convincing anecdotal and statistical evidence is potent." 941
F.2d at 919.  In EEOC v. O & G Spring and Wire Forms Specialty Co.,
38 F.3d 872, 878 (7th Cir. 1994), cert. denied, 513 U.S. 1198
(1995), statistical evidence established only that the employer in
question had no African-American employees; the anecdotal evidence,
limited to a sampling of four disappointed applicants, was relevant
to demonstrating discriminatory conduct. The plaintiffs
successfully established a prima facie case of a pattern or
practice of disparate treatment. In Ensley Branch, NAACP v.
Birmingham Fire Fighters Ass'n 117, 31 F.3d 1548, 1565 (11th Cir.
1994), the Eleventh Circuit stated that anecdotal evidence could be
"used to document discrimination, especially if buttressed by
relevant statistical evidence."
    In the instant case, experienced school administrators and
officials, such as Superintendent Payzant and Vice-Chair Gittens,
offered their judgment, on the basis of extensive day to day
experience with the Boston school system, that there were links
between prior discrimination in the system, low teacher
expectations, and the achievement gap. Dr. Trent offered his expert
opinion on these links without challenge to the admissibility of
his testimony.  He testified that his conclusions were based on a
reasonable methodology in his profession.  He evaluated statistics
documenting student performance and teacher histories in the Boston
school system. He studied the observations of a well-trained
administrator in the Boston school system describing teacher
performances in the classroom, the impact of these performances on
students, and faulty attempts to alter teacher attitudes. He knew
the history of segregation in the Boston school system.  Seeing
statistics and patterns in Boston that he had observed in other
school systems where he had found a link between student
achievement gaps and prior discrimination, he testified to the
probability of such a link in the Boston school system. He had an
adequate basis for making that judgment.
    The majority also finds fault with Dr. Trent's testimony, and
the Committee's case generally, because of the failure to control
for "competing explanations for current realities." In the
majority's view, the Committee's evidence had to account for other
variables that might explain all or part of the achievement gap in
terms of societal discrimination. This insistence reflects a
misconception of the School Committee's evidentiary burden, and
would elevate the Committee's evidentiary burden far beyond the
prima facie standard contemplated in the Title VII cases.  The
Committee did not have to present proof that would permit the court
to make an independent finding of causation.  The Committee had to
satisfy the court that the Committee had before it a strong basis
in evidence for its judgment that the achievement gap is linked to
past discrimination in the Boston school system. As indicated by
the discussion of the Supreme Court and First Circuit precedents in
Part II, that strong basis is provided by a prima facie case of
causation. In voluntarily undertaking remedial measures, the School
Committee did not have to establish an airtight case for its own
liability to minority students. By setting the bar of proof for the
School Committee unrealistically high, the majority has ignored
precedents that impose only a prima facie burden on the School
Committee.
    Contrary to the majority, I believe that Boston Police
Superior Officers Federation v. City of Boston, 147 F.3d 13 (1st
Cir. 1998), where we upheld an affirmative action program, supports
the conclusion that the School Committee satisfied its evidentiary
burden to justify the remedial measure. In Boston Police, we first
relied upon "the BPD's history of racial discrimination [that] is
well-documented in the decisions of this court." Id. at 20. We
described the twenty years of litigation attempting to remedy the
department's discrimination against African-Americans. We relied
upon court findings made seven years prior to the litigation at
issue and specifically noted that "we do not think this evidence is
too temporally remote to justify the conclusion that the BPD's past
racial discrimination has manifest effects in the present status of
black officers." Id.  We considered the statistical evidence that
demonstrated a continuing disparity between African-American and
white police officers being promoted to lieutenant positions.  We
then concluded:  
    This tortuous history, combined with the persistent
    effects of discriminatory practices at the entry and
    sergeant levels, sufficiently links the BPD's past
    discrimination and the statistical disparities
    contemporaneous with Ruiz's promotion.  Given the BPD's
    halting and, at times, quite modest progress in remedying
    its earlier discrimination, we are reluctant to infer
    that the vestiges of that discrimination had
    substantially disappeared when the BPD promoted Ruiz. The
    evidence warranted the district court's conclusion that
    the 1996 "statistical disparity combines with judicial
    findings of past entry-level discrimination by the BPD to
    imply convincingly that historical discrimination has
    affected the promotion of minority sergeants to the rank
    of lieutenant, and that the lingering effects of that
    discrimination were present in 1995 when the BPD promoted
    Ruiz."

Id. at 22-23 (citations omitted).  Implicit in our decision in
Boston Police was the common sense proposition that a long history
of discrimination in a social institution affects for a
considerable period of time the attitudes and behavior of people
who have worked in that system.  Although such history, standing
alone, cannot provide the strong basis in evidence for a public
entity's adoption of an affirmative action program, it can
contribute to the evidentiary basis underlying the judgment that
there is a causal relationship between a current outcome, such as
an achievement gap, and past discrimination.  The Committee
appropriately invokes that history to support, in part, its
admission program for Boston Latin.  
    I am concerned that the majority's evidentiary requirements in
this case will force school systems contemplating affirmative
action programs designed to address the effects of past
discrimination to establish, through the collection of quantifiable
social science data, that past discrimination is the sole or
primary cause of variable achievement. Given the Supreme Court's
emphasis on the prima facie justification for such an initiative,
I conclude that "substantial factor" causation meets the causal
burden of production for a prima facie case. In his dissent in
Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), Justice
Stevens noted that under existing law the notion of a prima facie
case under Title VII contemplates a similar standard. As he put it,
the asserted causal link between the acts of an employer and the
harm to a Title VII plaintiff  "must have substance" but "need not
constitute the sole or primary cause of the harm." Id. at 672-73
(Stevens, J., dissenting).  This standard reflects the general tort
standard embodied in the Restatement; See Restatement (Second) of
Torts  430-433 (1965). As Justice Stevens also noted, it is
consistent with the views of a majority of Justices in Price
Waterhouse v. Hopkins, 490 U.S. 228 (1989). It is also consistent
with Congress' response to that decision in the 1991 Civil Rights
Act.
    The evidence presented by the School Committee established a
prima facie case that differential teacher expectations, grounded
in the long history of segregation in the Boston school system,
were a substantial causal factor in the undeniable achievement gap
found in the Boston school system. In the face of this evidence,
Wessmann had the burden of challenging the Committee's prima facie
case by disproving the alleged causal linkages between prior
discrimination, teacher expectations, and the achievement gap.
4. Plaintiff's evidence challenging the causal link
    Wessmann conceded the existence of the achievement gap but
attempted to rebut the causal explanation advanced by the Committee
by asserting a "neutral explanation" for the disparities (that is,
that they were due to socioeconomic conditions attributable, at
most, to societal discrimination). Wessmann's only witness on these
matters, Professor Stephan Thernstrom, hypothesized that three
variables poverty rates, levels of education, and family
structures might be the cause of the achievement gap in the Boston
system. He based his hypothesis on national statistical evidence
that demonstrates powerful relationships between low achievement
and poverty rates, levels of education and family structure.
Professor Thernstrom suggested that, if a controlled study had been
done to isolate the causes of the achievement gap, the study would
have revealed that any causal connection between the achievement
gap and teacher expectations was insignificant. He further rejected
the Committee's argument that low teacher expectations are
connected to prior discrimination on the basis that the Committee
did not conduct a study on this issue.
    During cross-examination, Professor Thernstrom acknowledged
that he had no data particular to Boston on any alternative causes
of the achievement gap, thus confirming his reliance on the
national statistics criticized by the Supreme Court in Croson.  He
also acknowledged that, in his recent book evaluating the causes of
a national achievement gap between students, he had written that
neither poverty rates, levels of education, nor family structure
could account for the national achievement gap between African-
American and white students. In fact, in a chapter titled "Low
Expectations, Low Performance," he stated that "ask little of
children in the way of academic achievement and little is what you
tend to get." In that chapter, he specifically cited actions of the
Boston School Committee in 1990, and stated that the Boston public
schools "were failing to do their job and most of all failing
African-American pupils."
    As the district court noted in its opinion, the one expert
witness to testify on Wessmann's behalf conceded that, ultimately,
alternative theories of causation could not fully explain the
achievement gap between white and African-American students.
Hearing this evidence, the district court rejected Thernstrom's
direct testimony and accepted only his cross-examination testimony,
along with other evidence presented by the Committee, in reaching
its conclusion that the Boston Latin admissions program
"appropriately addressed the vestiges of discrimination that linger
in the Boston Public School system." 996 F. Supp. at 131.
    By asserting that the district court erred in crediting the
extensive observational testimony of experienced, well-trained
school administrators, and by requiring quantifiable data to
establish a causal link between past discrimination and present
outcomes, the majority would reduce strict scrutiny to a standard
that is indeed "fatal in fact." See Adarand, 515 U.S. 200, 237
(1995).  In my view, the district court properly concluded that the
School Committee had a strong basis in evidence for adoption of the
Boston Latin admissions program, thereby meeting its evidentiary
burden, and that the plaintiff failed to carry her burden of
persuading the court that this affirmative action program was
unconstitutional.
                             IV.
Narrow Tailoring
    To survive strict scrutiny, the School Committee's admissions
program must serve a compelling interest in remedying past
discrimination and must also be narrowly tailored to serve that
goal. "When race-based action is necessary to further a compelling
interest, such action is within constitutional constraints if it
satisfies the 'narrow tailoring' test this Court has set out in
previous cases." Adarand, 515 U.S. at 237. United States v.
Paradise, 480 U.S. 149 (1987), is the leading Supreme Court case on
the meaning of narrow tailoring. It emphasizes the following
factors: "the necessity for the relief and the efficacy of
alternative remedies; the flexibility and duration of the relief,
including the availability of waiver provisions; the relationship
of the numerical goals to the relevant labor market; and the impact
of the relief on the rights of third parties." Id. at 171.  
Fundamentally, narrow tailoring analysis asks whether a program is
"overinclusive" or "underinclusive" to serve the purposes of the
specific compelling interest on which the program is based.  Seegenerally id. at 190 n.1 (Stevens, J., concurring); Church of the
Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546
(1993).
     The following language from Croson offers some insight into
the rationale underlying these factors:
    [The narrow tailoring prong of strict scrutiny analysis]
    ensures that the means chosen "fit" [the] compelling goal
    so closely that there is little or no possibility that
    the motive for the [racial] classification was
    illegitimate racial prejudice or stereotype.

         Classifications based on race carry a danger of
    stigmatic harm. Unless they are strictly reserved for
    remedial settings, they may in fact promote notions of
    racial inferiority and lead to a politics of racial
    hostility.

Croson, 488 U.S. at 493. On this account, the "narrow tailoring"
and "compelling interest" requirements serve the same purpose:
ensuring that the program in question is not simply motivated by a
desire to favor one race. "Narrow tailoring" serves the additional
purpose of minimizing inadvertent harms that may result from an
affirmative action program, on the basis of a "cost-benefit"
analysis. Given these narrow tailoring considerations, I am
satisfied that the School Committee has produced a race-conscious
admissions program for Boston Latin which is narrowly tailored to
address a compelling remedial goal.
1. Flexibility and Duration of the Relief
    The admissions program's racial/ethnic composition standards
automatically vary each year with the composition of the Qualified
Applicant Pool. The record indicates that there has been some case-
by-case flexibility in the past: a well-qualified Native American
admittee who would not have been admitted under a mechanical
application of the program's guidelines (there was too low a
percentage of Native Americans in the qualified pool that year to
have a spot allocated to that racial/ethnic group) was nonetheless
admitted after a glance at the straight composite-score ranking
indicated this student had placed above the lowest-ranked admittee.
    The limited duration requirement has generally been met by
"built-in mechanisms" to shrink the scope and limit the duration of
remedial programs. See Boston Police, 147 F.3d at 23, 24-25
(quoting Mackin v. City of Boston, 969 F.2d 1273, 1278 (1st Cir.
1992)). A race-conscious program's "temporary" nature ensures that
it "will not last longer than the discriminatory effects it is
designed to eliminate." Fullilove v. Klutznick, 448 U.S. 448, 513
(1980) (Powell, J., concurring). The policy at issue here is
explicitly subject to review. The superintendent must present
findings and recommended modifications to the Committee every three
years.  The district court found that the review provision "ensures
that the Policy will not outlive the examination schools'
compelling need for it." 996 F. Supp. at 132. While it is not
"self-terminating" in an involuntary, mechanical sense, nothing
about this race preference implies permanence in the sense of the
Supreme Court's general warning against "remedies that are ageless
in their reach into the past, and timeless in their ability to
affect the future." Wygant, 476 U.S. at 276 (plurality); see alsoCroson, 488 U.S. at 498.
2. Relationship of the Numerical Goals to the Composition of the
Qualified Pool
    This element of narrow tailoring assures that the
beneficiaries of any program will be qualified, thereby minimizing
the cost of the preference to society while assuring that the
favored applicants are not unjustly enriched. Cases approving
preferences in the promotions of police officers cite the
"relationship of the [program's] numerical goals to the relevant
labor market," Paradise, 480 U.S. at 171, or the fact that the
preference is directed accurately towards "the smaller group of
individuals who possess the necessary qualifications . . . ."
Boston Police, 147 F.3d at 21 (quoting Croson, 488 U.S. at 501).
This "qualification" factor does not make the transition from the
employment to the educational context gracefully: education, after
all, is directed at shaping individuals in a prospective manner.
Students ranking in the lower half of the applicant pool by
composite score had succeeded at Boston Latin in the past
(Headmaster Contompassis recalled one in the sixty-fourth
percentile from the top who graduated near the top of his class).
Nonetheless, the Committee's admissions program has clearly been
structured to meet this qualification requirement. No one is
admitted, on account of the "flexible racial/ethnic guidelines,"
from outside the qualified applicant pool (or even from anywhere
near the median score point).  In fact, for the 1997-1998 school
year, all students admitted were within the top 10.6% (by composite
score rank) of the applicant pool.
3. Impact of the Relief on the Rights of Third Parties
    In Paradise, the Court asked if the promotion preference given
in that case was an "absolute bar" to advancement. See Paradise,
480 U.S. at 171, 182-83 (quoting Local 28 of Sheet Metal Workers v.
EEOC, 478 U.S. 421, 481 (1986)). Without minimizing the
disappointment Sarah Wessmann feels at her exclusion from Boston
Latin, the answer to the analogous inquiry in this case is clearly
"no." Forty-five spots were open to Wessmann on the basis of
composite score alone, and several times as many were available
when Wessmann attempted to enter at the seventh grade level (even
accounting for the 35% set-aside which existed during that year).  
    The numerous employment promotion-preference cases also ask
whether the preference imposes a layoff-like burden, i.e., whether
it defeats legitimate entrenched expectations of the disfavored.
Layoffs raise more severe narrow tailoring concerns than a hiring
preference:
    In cases involving valid hiring goals, the burden to be
    borne by innocent individuals is diffused to a
    considerable extent among society generally.  Though
    hiring goals may burden some innocent individuals, they
    simply do not impose the same kind of injury that layoffs
    impose.  Denial of a future employment opportunity is not
    as intrusive as loss of an existing job.

Wygant, 467 U.S. at 282-83. Rather than being removed from a
superior school because of a racial preference, Wessmann was denied
the opportunity to move from a good school to a better school.
There is no constitutional right to attend a school of one's
choice. See Johnson v. Bd. of Educ., 604 F.2d 504, 515 (7th Cir.
1979); United States v. Perry Cty. Bd. of Educ., 567 F.2d 277, 279
(5th Cir. 1978). It is true that Wessmann, unlike the non-promoted
police officers in Stuart or Boston Police, will not have another
chance to enter Boston Latin. However, her situation resembles
denial of a promotion with retention of current job status: she
remains at the Latin Academy which, while not the equal of the
Latin School in terms of overall student performance, is
nonetheless "challenging" Wessmann, according to the affidavit of
her Headmaster, the trial testimony of her father, and other
evidence in the record.
4. Necessity of Relief to Achieve the Compelling Interest, and the
Efficacy of Alternative Remedies.
(a) Necessity of relief to achieve the compelling interest
    "To evaluate [a determination of necessity] we must examine
the purposes [a preference program] was intended to serve."
Paradise, 480 U.S. at 171. Here, that goal is to overcome
expeditiously the effects of past discrimination in the Boston
schools. Urgency of relief is a legitimate consideration in finding
necessity. See Paradise, 480 U.S. at 173-77.  If admissions had
been based on straight rank order for the 1997-1998 school year,
the percentage of those invited to the seventh grade who were
African-American would have dropped from 13% to 6%; for Hispanics
the drop would have been from 5% to 3%. For the ninth grade, the
dropoff would have been 21% to 14% for African-Americans and 10% to
7% for Hispanics. Given the low levels of African-American and
Hispanic students who would have been admitted to Boston Latin on
a straight-from-the-top admissions methodology (in comparison to
either the general population, the composition of the entire public
school system, or of the qualified applicant pool), a preferential
program was required to remedy the lingering effects of de jure
segregation in the system.
    Given that one of the standards for evaluating narrow
tailoring is over- or under-inclusiveness to the purpose, one might
ask whether this program is "underinclusive" to address the
remedial needs facing the School Committee. The ultimate impact in
numbers is small eleven of ninety invitees to the ninth grade, and
thirty-seven of 440 to the seventh, were admitted who would not
have been if straight rank order admissions had been used. Overall,
the preference affects outcome for about 9% of all admittees. The
resulting representation of African-Americans and Hispanics in the
student body of Boston Latin does not even approach proportionality
with the composition of the Boston public school system as a whole,
which is 74% African-American and Hispanic.
    Wessmann asserts that underinclusivity is evidence that the
program is only intended to address an interest in diversity. Where
affirmative action deals with selective programs like promotions or
competitive schools, however, the impact of the preference may have
to be small because of the narrow tailoring requirement that
beneficiaries be qualified. Any preference can only respond to
remedial needs in proportion to the success of minorities in
raising themselves into the qualified pool. Thus, the preference in
Stuart, for example, gave "only limited advantage" to minority
applicants, increasing their numbers "gradually over time." 951
F.2d at 454. Under the circumstances, there is no grounds for
holding that the program here is not narrowly tailored towards the
remedial goal because it pursues that goal deliberately.
(b) Efficacy of alternative remedies
    The Committee adopted race neutral alternatives to work
towards a race-blind policy in the future. These alternatives
include more extensive schooling (extra classes during the school
year and summer school), enhanced school programs (the advanced
work classes), and admissions test preparatory courses in the
public schools feeding into the exam system. However, Professor
Edwin Melendez, a School Committee member, described the
alternatives as "not a panacea to deal with the issue of unequal
access overnight," but rather as "definitely a long-term strategy."
The alternatives did not address adequately the problem of urgency.
    The School Committee also considered alternative admissions
plans detailed by an outside consulting firm. Consideration of
these proposals was delegated to a special ad hoc Task Force,
composed of a broad array of concerned individuals and experts
including two members of the School Committee, Professor Charles
Ogletree of Harvard Law School, several individuals with experience
in formulating affirmative action programs, and numerous public
figures with personal connections to Boston Latin from various
ethnic communities within the city. The Task Force held eight
committee meetings and five neighborhood hearings, all open to the
public. The Task Force members discussed and evaluated the
consultant's initial proposals and then worked closely with the
consultants until a plan emerged that was satisfactory to the
remedial needs at issue here. This plan was presented by the Task
Force chairs to the School Committee, which also heard the views of
the dissenting members of the Task Force. Further public hearings
were held to consider the final Task Force report before it was
adopted by the Committee.  There is no indication in the record
that any less race conscious program was ever proposed to the
Committee (before or during this litigation) which could have
effected immediate remedial relief while simultaneously maximizing
the quality of the student body.
    Relying on Podberesky v. Kirwan, 38 F.3d 147, 160-61 (4th Cir.
1994), Wessmann argues that the Committee must show that a
race-neutral policy was first tried, not just considered, and that
it failed to accomplish the goal in question. In that case,
however, Podberesky himself submitted the proposed race neutral
plan which piqued the interest of the Fourth Circuit. His plan had
obviously not been considered by the university. In this case,
several race neutral plans presented by the consulting firm to the
Committee were rejected after consideration as inadequate to the
purpose of immediate remediation. Moreover, there is no Supreme
Court authority for the proposition that implementation of a
racially-preferential plan must be preceded by a failed race-
neutral attempt to accomplish the same goals.

The Majority's Narrow Tailoring Critique
    The majority cites three narrow tailoring deficiencies in the
Committee's admissions program: (1) African-American and Hispanic
applicants from private schools were by definition not hurt by the
inadequacies of the public schools, and thus should not be allowed
to benefit from any remedial program; (2) basing admissions on the
composition of the remaining qualified applicant pool will not
necessarily benefit African-Americans and Hispanics, despite the
fact that the program is predicated on remedying past
discrimination against those groups; furthermore, the program
benefits racial groups not victimized by discrimination in the
Boston schools; and (3) the program does not directly address the
problem of lower teacher expectations.  The subtext of these
arguments is a suggestion that the program is justifiable only on
racial diversity grounds, and that it is tailored only towards a
form of racial balancing.
1. The inclusion of minority applicants from private schools
    Our Constitution has always protected the right of parents to
choose a school by moving to another district, by opting into a
suburban busing program like METCO, or by sending their children
to private school. It therefore seems incongruous to punish the
initiative of those who removed their children from an educational
environment tainted by vestiges of discrimination. Moreover, there
is no reason to assume that leaving the public school system was
not in itself a burden on these families. If there were hardships
involved for families that fled the public schools (tuition,
transportation, adjusting in general to the transition), those
hardships could be fairly linked to the past discrimination that
made the public schools an unacceptable environment for their
children in the first place.
2. Potential disfavoring of groups subject to past discrimination;
separate categorization of whites, Asians and Native Americans
    The majority notes that Hispanics, "archetypical victims of
discrimination," could potentially be disfavored by the program
under a hypothetical scenario whereby their representation in the
remaining qualified applicant pool was concentrated near the top of
the composite score rankings.  That potential for Hispanics (or,
for that matter, African-Americans) to be disfavored at Boston
Latin suggests some limitations in the Committee's remedial
program. Those limitations do not discredit the program.  If the
facts in one particular year were so anomalous that the program
disfavored either African-Americans or Hispanics, the case-by-case
flexibility documented above could be invoked to remedy the
anomaly.
    The majority raises a troubling point when it questions the
School Committee's separate categorization of Asians under the
admissions program's racial/ethnic guidelines. Perhaps it would
have been preferable to group Asians together with whites and any
other identifiable groups against whom there was no asserted
history of discrimination. However, in the context of the long
history of de jure discrimination against African-Americans and
Hispanics in the Boston school system, this separate categorization
of Asians does not undermine the fundamental remedial purpose of
the admissions program. Moreover, the record suggests the
possibility of a remedial interest with regard to Asians. There is
evidence of a significant language-skills achievement gap for Asian
students in the public schools.  If there is future litigation
about this aspect of the program, more achievement gap evidence
relating to Asians might be produced.
3. Not directly addressing lower teacher expectations
    The majority opinion and the concurrence both find a narrow
tailoring flaw because the School Committee's admissions program
does not directly address the problem of lower teacher expectations
for African-American and Hispanic students, identified by the
School Committee as a vestige of discrimination and a substantial
causal factor of the achievement gap. The admissions program is
designed to remedy the impact of lower teacher expectations, and
not the expectations themselves and is perfectly acceptable as
such. Although the School Committee has a responsibility to
eliminate the vestiges of discrimination from the system over time,
the Committee also has a responsibility to address the harm those
vestiges currently impose on African-American and Hispanic
students.
    If the School Committee was not simultaneously addressing the
underlying teacher expectations problem, there might be a narrow
tailoring concern related to the duration of the remedial program.
The School Committee is, in fact, addressing this underlying
problem. It has been making substantial efforts towards instituting
a standardized curriculum in the primary schools. A standard
curriculum sets forth what is expected from every student,
independently of what any individual teacher might otherwise expect
from any individual student. Under the Focus on Children reform
initiative, adopted in August 1996, citywide curricular standards
are to be implemented within five years. The School Committee is
also making more direct efforts to address the problem of teacher
bias. For several years it has retained the services of the
Efficacy Institute, an educational firm which had previously
undertaken large-scale teacher reeducation in the New York City
public schools.
                              V.
Conclusion
    The majority characterizes my dissent as "wishful thinking"
about the meaning of Wygant, Croson and other Supreme Court
precedents in this difficult area of the law. Not surprisingly, I
disagree. I believe that I am faithful to those precedents and,
unlike the majority, apply them accurately to the evidence
presented to the district court.
    The majority goes awry because it reads Wygant's requirement
of a "strong basis in evidence" for an affirmative action program
and Croson's reference to a "searching judicial inquiry" into the
justification for an affirmative action program as demands for
evidence grounded in quantifiable social science data rather than
human judgments.  There is no such demand in Wygant, Croson or any
other Supreme Court precedent. Numbers are not the only source of
the requisite degree of certainty about low teacher expectations
for minorities and causation. In this case, the extensive
observations of experienced administrators in the Boston public
schools, supplemented by the testimony of a highly qualified expert
who recognized in the Boston public schools a phenomenon he had
studied extensively elsewhere, were as probative as the statistical
surveys and regression analyses demanded by the majority.
    The majority also goes awry because it uses Croson's reference
to a "searching judicial inquiry" as the basis for disregarding two
critical points made by Justice O'Connor in Wygant:
    (1) The strong basis in evidence required of a public
    entity defending an affirmative action program in court
    is provided by evidence sufficient to support a prima
    facie case of discrimination against the favored
    minority.

    (2) "In 'reverse discrimination' suits, as in any other
    suit, it is the plaintiffs who must bear the burden of
    demonstrating that their rights have been violated."

We applied this evidentiary framework in Stuart, thereby signaling
to the district court its applicability in this affirmative action
case. The district court followed that teaching, and we should as
well.
    For all of the reasons stated herein, I would affirm the
judgment of the district court.

</body>

</html>